[No. 30057.   Department Two.   April 10, 1947.]

ALBERT IRON *et al., Appellants,* v. VIRGIL SAUVE *et al., Respondents.*[1]

[1]Reported in 179 P. (2d) 327.

*J. P. Tonkoff*, for appellants.

*M. C. Delle* and *Thomas E. Grady*, for respondents Sauve.

*Brown & Hawkins*, for respondent Chaffee.

HILL, J.—Appellants sue to recover damages for personal injuries sustained by Helen Iron, Iola Iron, and Gertrude Bullingsight, who were injured when the truck of respondents Mr. and Mrs. Virgil Sauve, hereinafter referred to as respondents Sauve, on which they were riding, was involved in a collision with an automobile driven by the defendant Oliver Halterman. Respondent S. E. Chaffee, hereinafter referred to as respondent Chaffee, was joined as a party defendant on the basis of an allegation in the amended complaint that Halterman and Chaffee

". . . were engaged in a joint venture under which they were together farming certain real estate and were growing certain turkeys, and that at the time of the accident . . . the defendant Oliver Halterman was performing and acting on behalf of himself and the defendant [respondent], S. E. Chaffee."

After all the evidence was in, the trial court sustained a challenge to its sufficiency as to the respondent Chaffee and entered an order of dismissal. After a verdict had been rendered in favor of the appellants against the defendant Oliver Halterman and the respondents Sauve, the trial court granted a motion for judgment notwithstanding the verdict as to the latter and entered an order of dismissal as to them.

This is an appeal from the order of dismissal as to respondent Chaffee, and from the judgment notwithstanding

the verdict and the dismissal entered in accordance therewith as to respondents Sauve.

The negligence of the defendant Halterman and of the driver of the truck of respondents Sauve is established by the verdict. We are concerned with but two questions: (1) Were respondents Sauve relieved from liability for the negligence of the driver of their truck by our host-guest statute (Rem. Rev. Stat., Vol. 7A, § 6360-121 [P.P.C. § 295-95])? (2) Was there evidence from which a jury could find that defendant Halterman was acting on behalf of respondent Chaffee?

From sharply conflicting evidence, the jury could have found that the three injured appellants and three other women went to the ranch of respondents Sauve from a labor station near Granger (a distance of two and a half miles) on the Sauves' truck, driven by their employee, with eight or nine others who had been working for them. The injured appellants were induced to make this trip by the employee's statement that "Sauve wanted more help." On their arrival, respondent Virgil Sauve said to the employee driving the truck:

" 'I want the ones that work yesterday and last night only, so you take these womanfolks back to the Labor Camp and come right back so we want to use that truck in the field.' "

On the way back to the labor camp, the collision occurred.

These women were not employees, nor prospective employees. They had, in effect, applied for work and been told that there was none available. Respondents Sauve were under no legal obligation to transport them to the labor camp; it was a courteous and costly gesture on their part. But for our host-guest statute (Rem. Rev. Stat., Vol. 7A, § 6360-121), the verdict of the jury would have to stand as against these respondents. The statute, so far as it is material, reads as follows:

"§ 6360-121 No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without payment for such transportation, shall have cause of action for damages against such owner or operator for

injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator . . ."

■ We will agree with the appellants that the social amenities usually associated with the host-guest relationship were lacking here, but, if the injured appellants were not guests, they were licensees within the purview of the statute. There was no payment for the transportation; no actual or potential benefit in a material or business sense could result to the respondents Sauve. There is no contention that the collision was intentional.

The language of this court in *Fuller v. Tucker,* 4 Wn. (2d) 426, 103 P. (2d) 1086, is most apropos:

"The question presented in the case at bar is foreclosed by our opinion in *Syverson v. Berg, supra* [194 Wash. 86, 77 P. (2d) 382]. In that case, we held that, to take a person riding with another out of the guest class—show 'payment for such transportation' (§ 1, chapter 18, Laws of 1933)— two requirements are necessary: (1) An actual or potential benefit in a material or business sense resulting or to result to the owner, and (2) that the transportation be motivated by the expectation of such benefit.

"Appellant has not met the requirements. A contra holding would be a misinterpretation of the host-guest statute, and we would thereby defeat the clearly declared intention of the legislature, as we said in *Syverson v. Berg, supra,*

" ' . . . to deny recovery, as against the owner or operator of the automobile, to a guest or licensee where no business advantage or material consideration accrued to the host in the transportation resulting in the injury.' "

Upon the evidence most favorable to the appellants' contention, recovery against respondents Sauve was precluded by the statute. The judgment of dismissal notwithstanding the verdict of the jury will be affirmed.

We turn now to the second question. To establish the liability of respondent Chaffee, the appellants rely upon what is called a "turkey growing contract," dated November 22, 1943, which was introduced in evidence as plaintiff's exhibit No. 3. The portions of that contract which are here material are as follows:

Paragraph No. 1 provides that Chaffee should furnish from three thousand to four thousand one-week-old poults in the spring of 1944. Halterman was

". . . to care for and feed said poults from the time the same are delivered until the time when the same are ready for market in the Fall of 1944, under the general instructions and direction of . . ."

Chaffee, and he agreed to co-operate with Chaffee "in making a success of said joint venture."

By paragraph No. 2, Chaffee agreed to furnish the equipment then on the land; by paragraph No. 3, he agreed

". . . to purchase all the feed and grain necessary to feed said turkeys during the entire season, and also agrees to mix a portion of the mash at the main ranch and deliver the same at the ranch where the turkeys are grown, as the same is required."

Paragraph No. 6 obligates Halterman to devote his

". . . time and attention to the farming of said premises and the growing of turkeys thereon commencing in March, 1944, and continuing until the turkeys produced have been marketed";

and he further, in paragraph No. 8, agrees to "furnish all the labor necessary in caring for said turkeys."

The concluding paragraph reads as follows:

"Each party agrees to co-operate with the other in making a success of said venture. It is the intention of the parties hereto that second parties [Haltermans] offset their labor against the financing of said enterprise by first party [Chaffee] as herein provided, and that first party is to have one-half the profits for financing the same, and second party one-half the profits for their labor."

Halterman, called as a witness on behalf of the appellants, testified that while this agreement was in effect, on September 11, 1944, he was driving his 1935 Dodge sedan from the ranch where the turkeys were kept, to the "main ranch" referred to in the contract, to mix some feed. He explains his purpose as follows:

"Q. Now, on the day this accident happened, you were going from your ranch up to Chaffee's ranch to grind some

feed? A. Yes; to mix some feed, it is already ground, just to mix it. Q. Why were you going to mix it yourself that day? A. Well, my hunting trip was coming up later on. I wanted to have enough feed ahead, I wanted to use it. I've hunted for twenty-three seasons straight, deer. I always had about a week's supply on hand; wanted to make sure, if something happened, the wife and boy wouldn't be out of feed for the turkeys. Q. It was your intention to go up there and help with mixing the feed so you would have plenty of feed on hand to feed these turkeys while you were gone? A. That's right. Q. It was your intention, after you mixed this feed, that feed later would be delivered to your ranch? A. That's right."

Before he reached the "main ranch," the collision with the Sauve truck occurred. He testified that he, personally, paid for the repairs on his car.

Respondent Chaffee testified that he had not asked Halterman to mix any feed; that Halterman had not asked his permission to do it; and that he (Chaffee) did not know that Halterman intended to do it. He further testified that Halterman had never before mixed feed, and that there was a man employed by the month to do that work. This was all the testimony bearing on respondent Chaffee's liability, and none of it was controverted.

Halterman was driving his own car; there was in the car no article which was being transported for the benefit of the partnership. As he drove down the road the morning of the collision, there was nothing to indicate that he was on partnership business. As a matter of fact, it can be inferred from the record that, when this action was commenced, respondent Chaffee was not made a party and he appeared as attorney for the defendant Halterman. It later developed that Halterman and Chaffee were partners in the "turkey growing contract" hereinabove referred to, and respondent Chaffee was then made a party defendant.

The test of the liability of the copartners for a tort committed by one member of the partnership is whether the wrong committed was within the scope of his agency.

"There can be no such thing as imputable negligence, except in those cases where such a relation exists as that of

master and servant or of principal and agent. In order that the negligence of one person may be properly imputed to another, they must stand in such relation of privity that the maxim *qui facit per alium facit per se* directly applies." *Bryant v. Pacific Electric R. Co.* 174 Cal. 737, 164 Pac. 385; *Nonn v. Chicago City R. Co.,* 232 Ill. 378, 83 N. E. 924, 122 Am. St. 114.

Ordinarily, that would depend upon a determination of the question whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership. 40 Am. Jur. 261, § 190; *Dulchevsky v. Solomon,* 136 Wash. 645, 241 Pac. 19.

" 'In truth, "the law as to partnership is undoubtedly a branch of the law of principal and agent; and it would tend to simplify and make more easy of solution the questions which arise on this subject, if this true principle were more constantly kept in view." Lord Wensleydale, in *Cox v. Hickman,* 8 House of Lords Cases 268, . . . "All questions between partners are no more than illustrations of the same questions as between principal and agent." Parke, B., in *Beckham v. Drake,* 9 M. & W. 79, p. 98 . . . The real and ultimate question in all cases like the present is one of agency.' *Eastman v. Clark,* 53 N. H. 276, 289 [16 Am. Rep. 192]. See also *Doe, J.* to same effect *Ib.* 331, 332." *Caswell v. Maplewood Garage,* 84 N. H. 241, 149 Atl. 746, 73 A. L. R. 433.

It is not enough for appellants to establish an agency relationship; it must be established that Halterman was doing something in furtherance of the purpose for which the relationship was created. In other words, it must be within the scope of the partnership. It may be agreed that the mixing of feed for the turkeys would be within the scope of the partnership, though not within the scope of the activities of Halterman as set forth in the contract. If Halterman had reached the point where he was actually engaged in mixing feed, though it was not work that he was expected to do and would be of no benefit to the partnership because it would have been done in any event, it might well be argued that respondent Chaffee would be liable if, by his negligence, defendant Halterman injured a third party. Possibly, under such circumstances, respondent Chaffee

would not be heard to say that, by their agreement, Halterman was not supposed to do that work, or that it was of no benefit to the partnership.

We do not have such a situation. Halterman was not mixing feed; there was no assurance that he would be permitted to mix feed when he arrived at the "main ranch." He was merely on his way to the "main ranch" with the intention of doing something which, if he was permitted to do it, might be regarded as being within the scope of the partnership. The "turkey growing contract" shows that the duties of Halterman were to be performed on the ranch where he lived and where the turkeys were kept. There was nothing in the partnership agreement that required the use of his car, or that even contemplated that he should have a car. The undisputed testimony is that respondent Chaffee had a man hired by the month to mix the feed. If that be true, there was no reason or purpose for Halterman to make this trip to the "main ranch" except to satisfy himself that there would be feed available while he went on a hunting trip, which trip certainly was not in furtherance of the interests of the partnership.

If we disregard the testimony of respondent Chaffee, as the jury was entitled to do, the appellants still have not established that, at the time of the collision, Halterman was acting within the scope of the partnership.

Crane on Partnership 227, § 54, says:

"It does not seem that a partner while engaged in travel from one arena of operations to another by means of an instrumentality which is subject to his exclusive control and ownership, and which is chosen by him for his own convenience or comfort out of many available modes of conveyance should be considered to be acting in the course of business."

In a note, the author suggests:

"If it were agreed by the partners that the expense of operation of a partner's automobile, while traveling on partnership business, were to be charged to the partnership as an expense of doing business, the operating partner might be regarded as engaged in a partnership act."

Crane apparently had a professional partnership in mind when stating the foregoing rule, for he precedes it with this statement:

"With the increasing use by members of professional partnerships, such as attorneys and physicians, of their individually owned and maintained automobiles in traveling on firm business from office to hospitals, patients' homes, courthouses, clients' places of business, and the like, the question is likely to arise of whether the operation of the automobile is a partnership act so as to create partnership liability for negligent injury to person or property of a stranger on the highway."

There is much less reason for holding the nonacting partner liable in the present case than would exist in the case of a doctor driving to the hospital to see a patient, or a lawyer driving to the courthouse to try a case. The doctor or lawyer is on his way to do something which it is his duty and responsibility to do and which is obviously of benefit to the partnership. His partners would of necessity know that he would use an automobile for that purpose. Here we have a partner traveling for no reason of duty or necessity, and without the knowledge of his copartner, utilizing an instrumentality subject to his exclusive control and ownership, intending to perform an act which would be of doubtful, if any, benefit to the partnership, if, in fact, he were permitted to perform it.

Some courts, recognizing the injustice of holding all partners liable under conditions where a partner is driving his own car and there is no evidence of his being engaged in partnership business except his own statement to that effect, have sought to protect the other partners by taking the position that such a statement is not sufficient evidence to establish that the negligent partner was engaged in partnership business. Thus, in *Mansfield v. Howell,* 218 Mo. App. 557, 279 S. W. 1058, a partner driving an automobile in the evening struck and injured the plaintiff. There was no evidence except the partner's statement at the hospital that he was driving the machine at the time to get equipment to be used in the partnership business. The court said:

"It is sufficient to state that there was evidence tending to prove the partnership, aside from this declaration, but there was no other testimony to show that Heutel was transacting partnership business at the time the accident happened other than his declaration."

The Missouri court concluded that it would be an injustice to permit one partner to commit a reckless act and then saddle the liability on the partnership on his admissions and declarations alone.

■ However, we prefer to take the position, as a rule of substantive law, that a partner not engaged in the immediate performance of partnership activities, who is traveling to a place where he intends to engage in such activities or from a place where he has engaged in such activities, if traveling at his own expense and by means of an instrumentality of his own choosing, in which the partnership has no ownership, and over which it has no control, and which it has not expressly or impliedly authorized him to use, and which serves no partnership purpose other than furnishing the said partner with a means of transportation, is not acting within the scope of the partnership.

This statement of the rule, while long, is not involved. It merely says that a partner is not acting within the scope of the partnership

(A) if he is not engaged in the immediate performance of partnership business;
(B) but is traveling to a place where he expects to engage in the performance of partnership business, or from a place where he has engaged in such business,
    (1) if traveling at his own expense
    (2) and in an instrumentality of his own choosing
        (a) which the partnership does not own,
        (b) which the partnership does not control,
        (c) which the partnership has not expressly or impliedly authorized him to use,
        (d) which serves no partnership purpose other than furnishing transportation to the said partner.

■ We believe that all of the elements of the foregoing rule are established by the appellants' own evidence and reasonable inferences therefrom: *i. e.,* from the "turkey

growing contract" and the testimony of Oliver Halterman (the record does not disclose that appellants called him as an adverse witness). In any event, the appellants had the burden of proving more than a mere agency and a tortious act. Since Halterman was not engaged in the immediate performance of partnership business when the tort was committed, they had the burden of proving that he was, at that time, acting within the scope of the partnership, which burden they have failed to sustain.

In every case that we have found in which negligence of a partner was imputed to his copartners, the partner was either in the immediate performance of partnership activities such as hauling coal (*Dixon v. Haynes,* 146 Wash. 163, 262 Pac. 119, 55 A. L. R. 1218), furniture (*Monk v. Jones,* 190 Ark. 1117, 83 S. W. (2d) 526), or logs (*Futch v. Addison,* 12 La. App. 535, 126 So. 590); or the plaintiff proved that the instrumentality which the negligent partner was using was owned by the partnership (*Tarlecka v. Morgan,* 125 Ohio 319, 181 N. E. 450; *Treon v. Shipman & Son,* 275 Pa. 246, 119 Atl. 74), or that he had express or implied authority from his copartners to use it (*Zondler v. Foster Mfg. & Supply Co.,* 277 Pa. 98, 120 Atl. 705).

There is not sufficient evidence to sustain a verdict against respondent Chaffee, because it is not established that Oliver Halterman was acting within the scope of the partnership.

The judgment of dismissal as to respondent Chaffee is likewise affirmed.

STEINERT, ROBINSON, and JEFFERS, JJ., concur.

MALLERY, C. J., dissents.

---

June 3, 1947. Petition for rehearing denied.