[No. 30301. Department Two. May 17, 1948.]

GEORGE MELOSEVICH *et al., Respondents,* v. BEN W. CICHY *et al., Appellants.*[1]

[1]Reported in 193 P. (2d) 342.

*Evans, McLaren, Lane, Powell & Beeks,* for appellants.

*Brodie & Brodie* and *Edwards E. Merges,* for respondents.

JEFFERS, J.—This action was commenced by George Melosevich and wife against Bernice Rhodes, as executrix of the last will and testament of Tim P. Kelly, deceased, and Joseph Schoen, W. W. Cichy, and Mrs. Jack O'Conner, doing business as the Royal Amusement Company, a copartnership, doing business as the Royal Amusement Company in Thurston county, in the city of Olympia, under the firm name and style of Tim Kelly Amusement Company, to recover damages for personal injuries received by plaintiffs, and property damages resulting from a collision between a car driven by Tim Kelly and one owned by plaintiffs, and being operated at the time of the accident by George Melosevich.

The accident was alleged to have occurred on April 18, 1945, at about eleven-thirty p.m., at the intersection of Capitol way and Seventeenth avenue, in Olympia, Washington. It was alleged that the negligence of Tim Kelly (which was set out) was the proximate cause of the accident and the resulting personal injuries suffered and property damage sustained by plaintiffs.

It was further alleged that the copartnership, doing business under the firm name of Tim Kelly Amusement Company in and about the city of Olympia, was engaged, among other things, in the operation, management, supervision, and maintenance of pinball machines within Thurston county, and particularly within the city of Olympia; that on the evening of April 18, 1945, at the time of the accident, Tim Kelly was driving in and about Olympia and Thurston county, on business of the copartnership, in that he was checking up on pinball machines and performing other services and duties in connection with the operation and maintenance of pinball machines; and that at such time Kelly was acting as a member of, and engaged in the business of, the copartnership.

The defendants Joseph Schoen, W. W. Cichy (whose true name is Ben W. Cichy, and will be so referred to hereinafter) and Mrs. Jack O'Conner, by their answer admitted that they, at all times mentioned in the complaint, were a copartnership, doing business as Royal Amusement Company, and as such were copartners of Tim P. Kelly, during his lifetime, doing business in and about the city of Olympia under the name and style of Tim Kelly Amusement Company. Defendants denied all the other material allegations contained in each of plaintiffs' purported causes of action, specifically denied that plaintiffs have been damaged in any sum whatsoever, and specifically denied that at the time of the accident Tim Kelly was acting as a member of, or engaged in behalf of any business of, the copartnership known as the Tim Kelly Amusement Company.

The action was dismissed as to Bernice Rhodes, the executrix of the estate of Tim Kelly, and, defendant Joseph Schoen having died, the action was dismissed as to him, so the only

remaining partners are Ben W. Cichy and Mrs. O'Conner.

The cause came on for trial before the court and jury on April 28, 1947. At the close of plaintiffs' case, counsel for defendants moved for a judgment of dismissal, on the ground that plaintiffs had failed to prove a cause of action against defendant Royal Amusement Company. This motion, after argument, was denied. On April 30, 1947, the jury returned the following verdict:

"We, the jury duly impaneled and sworn to try the above entitled cause, do find for plaintiffs and against defendants and hereby assess plaintiffs' recovery in the sum of $10,-125.00."

Defendants filed motions for judgment notwithstanding the verdict and in the alternative for a new trial, which motions were denied, and judgment was entered on the verdict May 27, 1947. Defendants have appealed from the judgment entered.

The assignments of error are (1) in refusing to grant appellants' motion for dismissal at the close of respondents' case; (2) in giving instruction No. 10; (3) in giving instruction No. 11; (4) in giving instruction No. 12; (5) in giving instruction No. 13; (6) in refusing to give appellants' requested instruction for a directed verdict, being requested instruction No. 1; (7) in refusing to give requested instruction No. 4; (8) in refusing to grant appellants' motion for judgment notwithstanding the verdict; (9) in refusing to grant appellants' motion for a new trial; and (10) in entering judgment against appellants.

There is no question but that the evidence shows that Tim Kelly was negligent, and that his negligence was the proximate cause of the accident and the resulting injuries and damages suffered by respondents. No contention is made by appellants to the contrary. In discussing the evidence, therefore, we shall not refer to or discuss the evidence pertaining to the collision or the injuries and damage sustained by respondents.

Tim Kelly died two days after the accident, as the result of injuries received in the collision. Ben W. Cichy and

Mrs. Jack O'Conner are the only surviving partners of Mr. Kelly in the Tim Kelly Amusement Company.

The first question discussed by appellants is: Was there sufficient evidence to warrant the jury in finding and concluding that Tim Kelly, at the time of the accident, was acting within the scope of the partnership business? This question is raised under appellants' assignment of error No. 8:

"The court erred in refusing to grant defendants' motion for judgment of dismissal notwithstanding the verdict of the jury."

It is not necessary to again state the rule relative to the consideration to be given by this court to the evidence when considering such a motion.

It is admitted that the Royal Amusement Company, a copartnership now composed of Ben W. Cichy and Mrs. Jack O'Conner, owned a fifty per cent interest in the Tim Kelly Amusement Company, and Tim Kelly owned the other fifty per cent. The copartnership operated in Olympia and vicinity under the trade name of Tim Kelly Amusement Company, and it was admitted by Mr. Cichy that Tim Kelly was given a free hand and was in charge of the operation of the partnership business in and around Olympia.

Because of Mr. Kelly's death, the methods used by him and the manner in which the operation of the business of the partnership was carried on by him were testified to by Woodrow Turner, who worked for and with Mr. Kelly for a considerable period of time prior to the date of the accident, and by other witnesses who knew Mr. Kelly and had observed his operations.

Mr. Cichy stated that the partnership agreement was entirely verbal.

Woodrow Turner was called as a witness for respondents and testified in substance as follows: He was working for Tim Kelly on April 18, 1945, and had worked for him since June, 1943. The Tim Kelly Amusement Company owned about fifty-six pinball machines, and on April 18, 1945, had about thirty-nine machines in operation at various places

in and around Olympia. Turner named the following as some of the places at which machines were located: Ben Moore's; Spar; Capital Cigar Store; Capital Lunch; Happy Home; East Side Club; Capitol Bowling Lanes; Lodge Springs; Gardner's Tavern at Nisqually. Mr. Turner's duties were the same as Mr. Kelly's—he collected from and serviced the machines. These machines were scattered around over about an eight-mile area.

"Q. Was it necessary for somebody to be on duty in order to service these machines every night? A. Yes. Q. Was it necessary, did you have a car? A. Yes. Q. That you used to make this loop? A. I did. I had one of my own and it broke down and I used Tim's. . . . Q. Sometimes you used Tim's car? A. Yes, at times I did. Q. Did the partnership pay you expense money for your automobile? A. I got fifteen dollars a week expense and gas money. Q. Could you have serviced this route without using a car? A. I hardly think so. I couldn't. It was impossible. Q. Did you and Tim go along together sometimes when you would be going on this route? A. Frequently, yes. Q. Did you ever see Tim buy gasoline for the car? A. Yes. Q. What money have you seen him use to buy gasoline for the car? A. Well, I don't know what money it was. It might have been company money, I imagine. He paid me, but I don't know, I couldn't say for sure. I think it was. Q. Did you ever see him use any money to buy gasoline that he had taken out of the machines? A. Yes; lots of times that is all we had. Q. Now, coming to the night of April 18th, 1945, tell the jury who was on duty that night. A. As I recall, I had called Tim a day or so before and told him I wanted to take that night off. He was to take care of the town."

Turner stated that he was out in the country until about eleven p. m., on the night of the eighteenth, at which time he came back to town and went into the Spar to get a sandwich and a cup of coffee before he went home; that while he was sitting at the lunch counter Kelly came up, and they passed the time of day; that this was about eleven p. m.; that Turner left for home, and Kelly was still in the Spar at the time he left.

The company had eight machines in the Spar at that time, and as Turner expressed it, there was "quite a bit" of work to do on them. To service the machines, they used a

screw driver and a tool kit which could be carried in their pockets. Kelly used a screw driver and a little crescent wrench. There was a tool kit kept at the Capital Cigar Store. The one on duty would visit the places where the machines were located two or three times in an evening.

"Q. What time would Mr. Kelly usually knock off work when he had the duty of servicing the machines? A. Well, it depended. At midnight, if there was a machine down we would stay and work. Q. He worked until at least midnight when he had the duty? A. Approximately, yes. I think the Spar closed, they close their doors at a quarter to twelve, usually, they used to. Q. If you went home earlier, can you state whether or not—or if Tim went home earlier can you tell whether or not he would be on call? A. Yes, if we were wanted, either one of us, they could call us any time. That was understood. Q. And you would get in your car and go and service the machine? A. Yes. I might get mad, but those were the rules."

Milford Martin, who was working in the Capital Cigar Store on the evening of April 18, 1945, stated that he knew Kelly well; that he recalled the evening of the accident; that he saw Kelly that evening at about seven o'clock, when he came into the Capital Cigar Store and fixed a machine.

W. J. Breuer, senior liquor inspector for the Washington state liquor control board, whose duty it was at that time to check on the taverns, was called by respondents, and stated that he knew Kelly and recalled the night of the accident; that he knew practically all the pinball operators and had seen them work on the machines; that he had seen Mr. Kelly work on the machines and collect from them. Mr. Breuer stated that he saw Mr. Kelly the first time on the evening of April 18, 1945, at about seven o'clock, in Ben Moore's tavern; that he again saw him about nine o'clock in the Capital Cigar Store; that while he was talking with Kelly, someone came up and told Kelly there was a machine out of order; that Kelly pulled out a bunch of keys and a screw driver, walked over to the machine, opened it, and fixed it so it would operate. The witness stated that he again saw Mr. Kelly about eleven p. m. in the Spar, at which time Kelly was sitting at the lunch counter.

Oliver Jernigan was called by respondents, and stated that he was a pinball mechanic and worked in Olympia and Thurston county; that he knew the pinball operators in Olympia on April 18, 1945, and that Tim Kelly was such an operator. He stated that he knew that Kelly worked for the Tim Kelly Amusement Company, which owned and operated pinball machines; that he knew some of the spots where the company had pinball machines. This witness knew how Mr. Kelly operated, because he was doing the same kind of work, and was doing special work for the Kelly Amusement Company, as a special officer, policing the machines.

"Q. Before we go into that, state the manner in which Tim Kelly operated, what did he do? A. Well, he repaired the machines. He packed a set of keys with him and most of the time a few tools, and whenever a machine breaks down in a place, why, he had a telephone for them to call at a designated place and this place of business goes and calls this phone and every hour, why, he would call that place to see if they had any breakdowns anywhere, and if he didn't I would walk around with him and we would go from one place to the other. Q. During what hours would this kind of duty last, what hours of the day? A. Well, the hours when the place is open, any time from ten o'clock in the morning to one or two o'clock the following morning. Q. Would he go in his automobile from one place to another in the course of this work? A. Yes, when the distance called for it. Q. Would he repair the machines right then and there? A. Yes. . . . Q. Who collected the money, who collects the money out of these pinball machines? A. Well, the operator collects it and divides with the place of business. At that time Tim Kelly and Woody Turner was working on their machines that they had at the time. Q. Collecting the money and fixing the machines? A. Yes."

The witness further stated that he had worked with Kelly at all times of day and night; that he saw Kelly the evening of the eighteenth, at the Capital Cigar Store, at which time Kelly was working on a machine.

"Q. Mr. Jernigan, what car did he [Kelly] use when you went around with him at times immediately prior to the accident, if you did? A. He used a Dodge, the one that he was in the wreck with."

On cross-examination, Mr. Jernigan stated:

"Q. Do you know where he received any calls, were you present anywhere when he received any calls? A. Nothing only when I called him myself. Q. Where would you call him? A. I called him at home and if I didn't get him there I would call the Red Top Taxi where he got his calls and anywhere he was at. The last few months I called him at the Fish and Chips. I have got him at home, usually found him at home or around the Capital Cigar Store or the Spar."

Ben W. Cichy was first called by respondents as an adverse witness, and stated that the Royal Amusement Company, a copartnership, not operating as such in the Olympia territory, owned fifty per cent of the Tim Kelly Amusement Company, and Tim Kelly owned the other fifty per cent; that the surviving partners in the Royal Amusement Company were the witness and Mrs. Jack O'Conner; that the only physical assets of the Tim Kelly Amusement Company were pinball machines. The witness stated that there was no written partnership agreement between Kelly and the Royal Amusement Company; that the profits of the Tim Kelly Amusement Company were split fifty per cent to Kelly and the other fifty per cent to Royal; that Kelly deposited in a bank in Olympia, under Tim Kelly Amusement Company, all the money he collected from the machines; that Kelly was supposed to make a monthly accounting to Royal, showing his collections and expenses; that he trusted Mr. Kelly and gave him more or less a free hand in the operation of the business. The witness admitted that he knew Mr. Kelly's duties required that he service these machines, and go around from place to place where the machines were spotted.

"Q. Did you know that he [Kelly] used his car to go from one place to another? A. He wasn't supposed to. Q. I say do you know that he used it? A. Well, he might have. He came to Seattle with it. I never saw him use his car in pursuit of his duties around Olympia here. . . . Q. Did you ever tell him not to use it? A. Well, we never had any definite understanding on that. If he did use it, it was understood if he used an automobile he had to pay the expense on it, so we never paid any attention to it. We didn't furnish an automobile for him."

Mr. Cichy was also called as a witness for appellants.

. "Q. Will you tell the jury again if it is not—well, what his duties were, what his agreement was in the partnership, what his duties were. A. His principal duties, he was in charge of the territory over here, and he was permitted to hire and discharge anybody, anyone that he saw fit. In other words, he run his business just like it was his own."

Mr. Cichy stated that he saw the reports made from time to time by Mr. Kelly, and that to his knowledge there was no charge for gas or oil for the operation of Mr. Kelly's car in those reports. Mr. Cichy admitted that he knew some of the machines were located outside of Olympia. Again Mr. Cichy was asked:

"Q. You gave Tim Kelly a free hand in the operation of this business, didn't you? A. That's right."

H. T. Lewis, the bookkeeper for appellants' partnership, was called by respondents as an adverse witness, and identified a report made by Tim Kelly covering the period from January 2, 1945, to February 20, 1945. This report shows, among the items of expense, miscellaneous, two hundred forty dollars.

Mr. Cichy admitted that he did not check the voucher to see what was included in the two-hundred-forty-dollar item.

Mr. Lewis was unable to present any voucher for the two-hundred-forty-dollar item, and it is apparent from the testimony of Mr. Lewis that Tim Kelly was allowed a generous expense account, and we think it also apparent that no particular examination of Mr. Kelly's expense accounts was made, as long as they were reasonable.

The deposition of Mrs. Bernice Rhodes was taken and introduced by appellants. Mrs. Rhodes stated that she was engaged to Mr. Kelly; that he died two days after the accident; that after the accident Mr. Kelly made a will, in which she was named as executrix. She further stated that she recalled the date of the accident, and that Mr. Kelly spent most of that day and practically all of the evening with her at her home. She further stated that Mr. Kelly did not do any work that day, and did not leave her home until about twenty minutes to twelve, at which time he stated he was

going home. She further stated that the most direct route for Mr. Kelly to take to reach his home was south on Capitol way. Mrs. Rhodes stated that she had formerly worked at the Spar as a waitress and had worked on the bar, and that she met Mr. Kelly when he came in to service the pinball machines.

It is apparent that the jury did not believe her testimony as to Mr. Kelly's activities on the evening of April 18, 1945, and, in view of the testimony of the three witnesses to which we have hereinbefore referred, they were certainly justified in so doing.

It is first contended by appellants that:

"There is no evidence that Kelly was engaged in the furtherance of partnership business at the time of the accident, but the evidence affirmatively shows to the contrary."

The uniform partnership act, Rem. Supp. 1945, § 9975-52, provides:

"Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

It may be admitted, as stated in 20 R. C. L. 882, § 94, that the law of partnership is a branch of the law of agency, and that the liability of one partner for the acts of his copartner is founded on the principles of agency. However, we think, from the very nature of a copartnership and the usual purposes for the forming of such an association in carrying on a commercial enterprise, that the general authority of one partner to represent and bind his copartners in carrying on the business of the copartnership is broader, unless specifically limited by the copartnership agreement, than is the authority of a mere employee or agent to bind his employer or principal. We quote from § 94, *supra*:

"Every partner in a commercial partnership, apart from any special powers conferred on him by the articles of copartnership, is not only a principal but also a general and

authorized agent of the firm, and the agent of all the partners for all purposes within the scope and objects of the partnership. Thus it is that a partner embraces the character both of principal and agent. With respect to the concerns of the partnership, he virtually acts as principal for himself and as agent for his partners. During the existence of a partnership therefore each member is deemed to be authorized to transact the whole business for the firm, his acts being treated as the acts of all, and binding on them just as if they were present and sanctioning that which is done, whether it is done in the firm name or in the name of a partner."

We also find in the same volume, 20 R. C. L. 914-5, § 126, the following statements:

"Each member of a partnership is personally liable for a tort committed by a copartner acting in the scope of the firm business. Such liability is not dependent on the personal wrong of the individual member of the partnership against which the liability is asserted. The test of the liability is based on a determination of the question whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership. If it was so committed, the partners are liable as joint tortfeasors. . . . The principles governing the liability of one partner for the tort of his copartners apply to torts based on the negligence of such partner."

We cite the above statements from R. C. L., not with the idea or intent to change or modify any rule announced by this court relative to the liability of a partnership for a tort committed by one of its members. But in considering the factual situation relative to such liability, if any, it should be kept in mind that, apart from some express limitation contained in the partnership agreement, a partner in a commercial partnership, such as Mr. Kelly, is not only a principal, but also a general and authorized agent of the firm, and the agent of all the partners for all purposes within the scope and objects of the partnership.

Appellants cite and quote from the case of *Iron v. Sauve,* 27 Wn. (2d) 562, 567, 568, 179 P. (2d) 327, as follows:

"The test of the liability of the copartners for a tort committed by one member of the partnership is whether the

wrong committed was within the scope of his agency . . .

"It is not enough for appellants to establish an agency relationship; it must be established that Halterman was doing something in furtherance of the purpose for which the relationship was created. In other words, it must be within the scope of the partnership."

We quote from the case of *Swanson v. Webb Tractor & Equipment Co.,* 24 Wn. (2d) 631, 648-50, 167 P. (2d) 146:

"It is a well-settled rule that the authority of a partner to act as agent for the partnership is limited to such transactions as are within the scope of the partnership business, and, conversely, that neither the partnership nor the other partners are bound by the unauthorized act of one partner in a matter not within the apparent scope of the business of the partnership. [Citing authority.] . . .

"So far as third persons are concerned, the authority of a partner, whether he be a member of a general partnership or of a special partnership, must be found in the actual agreement of the partners, or through implication arising from the nature of the business or the actual or usual manner in which it is conducted by the particular partnership or by similar partnerships in the same locality, or else from a reasonable inference of its necessity or fitness for the successful operation of the particular partnership business."

 We are of the opinion that there was substantial evidence in this case justifying the jury in concluding that Tim Kelly, at the time of the accident, was engaged in performing duties in the furtherance of the partnership business; in other words, that he was acting within the scope of the partnership business. There was ample evidence to show that Mr. Kelly was actively engaged in the duties required of him on the night of April 18, 1945; that his duties necessitated that he go from place to place where the partnership had machines located; that he was on call at all times from ten a. m. until one or two o'clock the following morning, at his home, the office of Red Top Taxi Company, or one of the taverns or cigar stores. It must be admitted that the accident happened during the hours when Mr. Kelly's duties required him to be on call. He was actually seen servicing one machine on the night in question, was seen at about

eleven p. m. in the Spar, where the company had several machines, and was seen in at least one other place where the partnership had machines.

In view of this evidence and the other testimony hereinbefore referred to, we certainly do not think it can be said, as stated by appellants in their brief, that "there is no evidence that Kelly was engaged in the furtherance of partnership business at the time of the accident."

Appellants further state in their brief:

"The evidence shows the partnership had no interest in or control over the Kelly car and paid no part of its operating expenses. It neither had nor exercised any control as to the methods of travel which Kelly might use even in the performance of his partnership duties."

It will be remembered that Ben Cichy stated that Kelly was given a free hand in the operation of the Tim Kelly Amusement Company.

We do not understand that it is essential in every case for one seeking to hold the members of a partnership liable for a tort committed by one of the members, to prove that the partnership had an interest in, or paid the operating expense for, the automobile being operated at the time of the accident by the member committing the tort. We quote from 5 Am. Jur. 728, § 393:

"The mere fact that an employee uses his own automobile in the business of the employer does not make the latter liable under the doctrine of respondeat superior for injuries inflicted by such employee in the operation of the automobile. If, however, the other circumstances involved in the case are *consistent with, or require, the inference that the activity in which the servant was engaged at the time of the tort complained of, and in which he was using his own car or one which he had hired, was within the scope of his employment,* the person injured may recover from the employer, if the servant's use of the automobile or other vehicle was authorized, *either expressly or impliedly.* Thus, if an employee, with the knowledge and assent of the employer, repeatedly uses an automobile, not owned by the employer, in the latter's business, the employer will be held to have impliedly authorized its use and to be liable for negligence in connection therewith." (Italics ours.)

In *Carlson v. P. F. Collier & Son Corp.,* 190 Wash. 301, 314, 67 P. (2d) 842, we stated:

"At the time of the accident, Floyd was working within the scope of his employment and had implied authority to operate the automobile. Floyd, as the servant or vice-principal of the appellant [Collier & Son Corp.] at the time of the accident, was performing an act in furtherance of the master's business. He was engaged in the transportation of the crew and keeping the members of that crew together until they arrived in Seattle, as he was directed to do, when the crew would be assigned to other territory. The operation of the car by Floyd was within the scope of his employment, *although it was not necessary for the proper performance of his duty to his master.* . . .

"*The fact that appellant did not own the automobile which Floyd was operating at the time. of the accident is not a determinative factor.* The applicable rule is stated, as follows, in 87 A. L. R. 787:

" 'If the circumstances involved in the case show that the activity in which the servant was engaged at the time of the tort complained of was *within the scope of his employment,* the *fact that the automobile or other vehicle used by him,* and which caused the injury, *belonged to or was hired by the servant,* will· not preclude the person injured from recovering from the employer, if the servant's use of the vehicle was, either expressly or impliedly, authorized by the employer.' " (Italics ours.)

In the case of *Rice v. Garl,* 2 Wn. (2d) 403, 409, 98 P. (2d) 301, the defendant Garl was an employee of the Standard Oil Company of California. At the time of the accident with which the case was concerned, Garl, while operating his own automobile, struck and injured Evelyn Rice, a minor. An action was brought on behalf of Evelyn Rice, by her guardian *ad litem,* against Garl and his employer. The action against the oil company was brought on the theory that Garl, at the time of the accident, was acting within the scope of his employment. The oil company alone appealed. The opinion states:

"The fact that Garl was driving his own car at the time of the accident does not compel a conclusion that he was not, therefore, then acting within the scope of his employment. Although there is a respectable number of cases which hold to the contrary, the weight of authority in this

country supports the rule, as stated by the annotator in 57 A. L. R. 739, 87 A. L. R. 787, and 112 A. L. R. 921, that: [Then follows the same statement hereinbefore quoted in the case of *Carlson v. Collier & Son Corp., supra.*]

Admitting that in the instant case Kelly owned the car he was operating on the night of the accident, and that the partnership had no interest therein, and assuming for the purposes of this case that appellants did not, knowingly at least, allow deduction from partnership funds for the expense of operating this car, still we are of the opinion that, when all the facts in the case are considered, including the admission that Kelly was given a free hand in the operation of the partnership business, the fact that there was no specific agreement as to whether Kelly should or should not use his car, or any car, in the performance of his duties, the fact that Cichy knew Kelly had a car, and that they were not interested in whether or not he used it in the furtherance of the partnership business, for the reason, as stated by Mr. Cichy, that, if Kelly did use his car, he was to pay for its operation from his own share of the profits, and the fact that it was reasonably necessary to use a car in performing the duties required of him, the jury were justified in concluding that Kelly had implied authority to use his car in the furtherance of the partnership business, and that, at the time of the accident, Kelly was using his car in the furtherance of the partnership business and was acting within the scope of the duties which he, as a member of the partnership actively in charge of the partnership business, was obligated to perform.

■■ Appellants contend the court erred in giving instructions Nos. 10, 11, 12, and 13. Appellants specifically excepted to instructions Nos. 10 and 11, for the following reasons:

"We except to the court's giving instruction number 10, which was plaintiffs' proposed instruction number 1, because the instruction is contrary to the law as set forth in the case of Iron versus Savey [Sauve], reported in 127 Washington Decisions at page 527 [27 Wn. (2d) 562]. We believe, in order for the partnership to be held liable, there must be evidence and an instruction that the partnership

was paying the expense of operating this car and that is not included in that instruction."

The same exception was taken to instruction No. 11, with this addition:

". . . also that the partnership, not owning the car, must have exerted some control over the car, and also in my exception to number 10, I would like to state that instruction should have been a statement that the partnership to be held liable must have exerted some control over the use of the car."

We cannot agree that, in order to hold the partnership liable for the negligent acts of Kelly, under the facts in this case, it was necessary for respondents to prove, or for the court to instruct the jury, that the partnership was paying the expense of operating the Kelly car. Nor do we think the *Iron* case, *supra*, unqualifiedly announces such a rule.

We have heretofore discussed the question of the necessity of payment of the operating expense of the Kelly car, and have concluded that, from all the facts and circumstances in the case, the jury were justified in finding that Kelly had implied authority to use his car in the furtherance of the partnership business. We are of the opinion the *Iron* case does not announce any rule to the contrary. We quote the rule announced in the *Iron* case:

"This statement of the rule, while long, is not involved. It merely says that a partner is not acting within the scope of the partnership

 (A) if he is not engaged in the immediate performance of partnership business;

 (B) but is traveling to a place where he expects to engage in the performance of partnership business, or from a place where he has engaged in such business,

 (1) if traveling at his own expense

 (2) and in an instrumentality of his own choosing

 (a) which the partnership does not own,

 (b) which the partnership does not control,

 (c) which the partnership has not expressly or *impliedly authorized him to use,*

 (d) which serves no partnership purpose other than furnishing transportation to the said partner." (Italics ours.)

An examination of the facts in the *Iron* case, *supra*, relative to the authority of the partner, Halterman, and relative to the activity in which he was engaged at the time of the accident in that case, will show a factual situation entirely different from the factual situation in the instant case.

Appellants further contend that the instructions should have contained a statement to the effect that, in order to hold the partnership liable, the partnership "to be held liable must have exerted some control over the use of the car." Actual control is not essential. The existence of the right to control is the important factor. There is no question but that the partnership had the right to control Kelly and his methods of operation. The evidence shows they did not do this, but left up to Kelly the manner and methods of the operation of the Tim Kelly Amusement Company.

We are of the opinion that instructions Nos. 10 and 11 properly state the law applicable to the facts in this case, and that appellants' objections, based upon their exceptions to such instructions, are not well taken.

Appellants base error on the giving of instruction No. 12, which reads:

"You are instructed that the plaintiffs need not prove that the partnership owned, nor controlled, nor paid for the upkeep or expenses of Tim Kelly's car in order for you to hold the other partners liable, provided, that you find from all the evidence that the partners Cichy, or O'Conner, or either of them, knew or should have known that Tim Kelly had been using his car on partnership business prior to the night in question."

Appellants contend that the instruction is erroneous, because it makes liability depend upon mere knowledge that Kelly had been using his own car, even though the partnership had no control over it.

This is only one instruction, and of course must be considered with the other instructions. This instruction purports to cover only one phase of the question. It was not necessary to repeat in every instruction what the jury were, by instruction No. 2, instructed that they must find, namely, "that at the time of the accident Kelly was driving

said automobile on business for the said partnership." We have concluded that the jury were justified in finding, from all the facts, that Kelly had the implied authority to use his car, and that at the time of the accident he was acting within the scope of, and in furtherance of, the partnership business.

We are of the opinion that instruction No. 12 is not inconsistent with instructions Nos. 2 and 3, as given, and that appellants' objections to this instruction are not well taken.

Exception was also taken to instruction No. 13, which reads as follows:

"You are instructed that if you find from the evidence in this case that Tim Kelly was paid out of partnership money, or used partnership funds, for the operating expenses of his car and that such payments were either expressly authorized by said partnership or impliedly authorized, then you may find that Tim Kelly was engaged in partnership business at the time of the collision of his car with that of the plaintiffs."

This instruction purports to cover only one element of partnership liability, and when considered in connection with the other instructions given, cannot, in our opinion, be said to be an erroneous statement of the law applicable to the particular element covered by the instruction.

■ Error is also assigned upon the refusal to give appellants' requested instruction No. 4, reading as follows:

"You are further instructed that certain evidence has been introduced tending to show that the said Tim Kelly after leaving the home of Bernice Rhodes on the evening in question, did stop at a certain place of business and while there did perform an errand having to do with the business of said co-partnership, and that he thereafter resumed his journey homeward. The court instructs you that if at the time of the accident in question this business errand had been completed and that he was at the time of the accident driving homeward on the same route that he would have taken even if no such business errand had intervened, then, under the law, it will be your duty to find for the defendants."

In the first place, we think the instruction purports to cover in part a factual situation not shown by the record.

We are further of the opinion the instruction is not a proper statement of the law applicable to the facts in this case.

Appellants state: "It has been our contention throughout that 'returning home' does not constitute partnership activity." The evidence shows that Kelly was on call at home during the hours he was on duty, and the evidence further shows that the accident occurred during the hours he worked and was on call.

Under the facts of the case, we are of the opinion that there is no testimony that Kelly, at the time of the accident, had ceased performing the duties which admittedly were required of him, and the mere fact that he might have been on his way home after servicing a machine or performing some other duty required of him would not, in our opinion, change the situation, for, as we have stated, he was as much on call at his home as at any other place, and we think the court was justified in instructing the jury, as it did in instruction No. 10, hereinbefore referred to, that they could find appellants liable, under certain conditions,

". . . providing you further find that Tim Kelly was using his car for partnership business or was returning from having engaged in partnership business on the night in question."

We again refer to the rule announced in the *Iron* case, *supra*, and the exception therein contained, which is to the effect that, where implied authority to use the automobile causing the damage is shown, the partnership may be held liable.

For the reasons herein assigned, the court properly denied appellants' motion for judgment notwithstanding the verdict and appellants' motion for a new trial.

The judgment is affirmed.

MALLERY, C. J., BEALS, STEINERT, and HILL, JJ., concur.