[No. 33689.   Department Two.   March 28, 1957.]

W. C. MADING, *Appellant*, v. ROBERT D. McPHADEN *et al.*, *Respondents.*[1]

[1]Reported in 308 P. (2d) 963.

*Geo. H. Rummens, Kenneth P. Short, Paul R. Cressman,* and *Richard M. Oswald,* for appellant.

*Cook, Flanagan & Colvin,* for respondents.

DONWORTH, J.—This suit was brought to recover $12,500 from two copartners. The complaint alleged that in August, 1953, plaintiff purchased a certain building in Seattle; that one of the defendant partners, Robert D. McPhaden, acted as plaintiff's agent in arranging the purchase of the property and made a secret profit of $5,000; and that the partnership had loaned plaintiff $60,000, for which they charged him a $7,500 "premium" in addition to interest at the rate of six per cent. The prayer asked judgment against both partners, and their respective marital communities, in the full amount of $12,500, representing the alleged secret profit and the "premium" on the loan. The case was tried to the court, which entered judgment of dismissal at the conclusion of the evidence. On appeal, plaintiff has abandoned his claim to all

but $625 of the $7,500 "premium" and now asks judgment only in the amount of $5,625.

The facts may be summarized as follows: Appellant was an experienced real-estate operator doing business in Seattle. Respondent Robert D. McPhaden (who will be referred to as respondent) was an accountant and a partner of respondent Armin Rembe in the business of lending money, usually on mortgage security.

They had previously made loans to appellant. For several years prior to 1953, respondent had prepared appellant's income tax returns. In May, 1953, respondent learned that a certain store and apartment building in Seattle, owned by Colin and Fenton Radford, was for sale at a price of $60,000. (The Radfords, also, had employed respondent periodically to do accounting work for them.) Respondent communicated this information to appellant, who visited the property and thought it a good investment. Some time later the two parties met again, and appellant told respondent he was interested, but was short of cash and would like to pay for the building by transferring to the Radfords contracts and options he held on certain Mason county real estate. Respondent communicated this offer to the Radfords, who refused it and insisted on cash payment.

After advising appellant of the Radfords' refusal, respondent tried to raise the necessary money on the strength of appellant's Mason county property, but was unable to do so. Negotiations then lapsed, and the matter lay dormant for several weeks. In July, 1953, the Radfords told respondent that they would sell the building for $55,000, and would accept one half of that sum in cash and the other half in the form of a purchase money mortgage *executed by appellant*. (In respondent's testimony at the trial, he intimated that he agreed, in return for the reduction in price, to abandon a claim against the Radfords for accounting services in the amount of $1,942.33. However, the testimony of the Radfords did not indicate that they recognized the claim as valid, and the trial court made no finding on the point.) Respondent, without telling appellant of the reduction in

price, decided to buy the property in his own name on those terms and resell it to appellant. He contacted appellant, who said he was still interested in buying for $60,000 if respondent could arrange the financing and, especially, if appellant could borrow $27,500 in cash in addition to the purchase money.

On August 7, 1953, respondent obtained an option from the Radfords to buy the property at any time prior to August 31st for $55,000. The option contained the following provision:

"In the event Optionee resells said property, Owners agree to loan to Optionee's purchaser the sum of TWENTY SEVEN THOUSAND FIVE HUNDRED DOLLARS ($27,500.00) on purchaser's installment note in the form attached hereto as Exhibit 'A', secured by a real estate mortgage on the form attached hereto as Exhibit 'B', on the above described property. In the event purchaser's mortgage is placed of record prior to the recordation of Owner's deed, purchaser shall not be required to furnish mortgagee's policy of title insurance."

During the following days, respondent made the necessary arrangements to finance the transaction. Part of the amount needed came from respondent's partner, Armin Rembe, part from respondent's own funds.

On August 21st, respondent presented to appellant for his signature an undated earnest money receipt which did not show the identity of the seller. The receipt included the following provision:

"This sale is subject to the following conditions: . . . (2) That the present owner of the above described real property fulfills the terms and conditions of the option to purchase the above described real property, which option the present owner has granted Seller."

Before appellant signed the receipt, the parties had a brief conversation about the progress of the transaction. Respondent testified as follows with regard to this conversation:

"Q. Did you tell him [appellant] that you had taken this option, Exhibit 4, for 55,000? A. I didn't tell him in so many words that I had taken an option or the conditions of it, but when he—when he signed his earnest money receipt, he

asked me if I had—if I had—if I had—if the Radfords had signed. And I said, 'No, they hadn't signed the earnest money,' I said, 'but I have—they have'—let me see, my wording was, 'they haven't signed the earnest money, but I have them signed up.'"

Respondent did not, however, tell appellant in what way the Radfords were "signed up," nor did he at any time reveal that the seller was to be anyone other than the Radfords. On the same day, August 21st, respondent gave the Radfords written notice of his election to exercise his option to buy the building for $55,000.

On August 22nd, appellant signed a note to Rembe and McPhaden for $67,500, to be repaid within four years at six per cent interest. Of the principal amount of the note, $7,-500 represented a twelve and one-half per cent "premium" for the use of the money. The note was secured by mortgages on appellant's Mason county holdings and by a second mortgage on the Radford building. Appellant also signed a note payable to the Radfords for $27,500, secured by a first mortgage on the building. On the same day, respondent requested appellant to meet him in the office of respondent's counsel for the purpose of closing the transaction. Appellant testified as follows concerning what transpired on that occasion:

"Q. And what occurred at that time? A. Well, Mr. Mc-Phaden told me that, finally, everything was in shape, and ready to close, and asked me to either to go over with him to Mr. Cook's office or to meet him there. And I did. And he had this whole stack of papers in connection with the deal. Just about the time we sat down to get into it, why, he pulled out his watch. He said, 'Oh, I have got to catch a plane for South Africa within an hour.' I think it was an hour or an hour and a half. He said, 'Doc, you close it with Mr. Cook. All of the papers are here.' And he left immediately."

(Appellant did not see respondent again until he returned from South Africa in November, 1953.)

On August 25th, two deeds to the Radford property were recorded simultaneously in the King county auditor's office. By one deed, dated August 24th, the Radfords conveyed the

property to respondent; by the other, dated August 22nd, respondent conveyed it to appellant. Only after the deeds were recorded and mailed to him did appellant learn that respondent had taken title to the property, and that the selling price specified in the option from the Radfords to respondent was $55,000. Appellant did not communicate directly with the Radfords about the transaction at any time; his negotiating was done entirely through respondent. Appellant, at all times prior to receiving the recorded deeds, understood that he was purchasing the property from the Radfords and that they knew appellant was the purchaser of their property even though they had given the option to respondent. Respondent kept the $5,000 difference in price as a profit.

Appellant's complaint alleged that "plaintiff and defendants on or about July 1, 1953, entered into an oral agreement that defendant McPhaden, as the agent of plaintiff, would arrange for the purchase of said property . . ." The trial court found, we believe correctly, that the evidence did not establish an express agency. Although the words and conduct of the parties tend to show that an implied agency existed (*Turnbull v. Shelton*, 47 Wn. (2d) 70, 286 P. (2d) 676 (1955)), we need not consider the question of agency at all in disposing of this case.

The determinative assignment of error is that directed to the court's finding of fact No. 10, which stated that appellant "has not alleged or proved a resulting trust." Of course, the finding must not be disturbed on appeal unless the evidence clearly preponderates against it. *McKown v. Davis*, 47 Wn. (2d) 10, 285 P. (2d) 1048 (1955), and cases cited.

It is well settled that where property is taken in the name of a grantee other than the person advancing the consideration, the one in whose name title is taken is a resulting trustee for the person who paid the purchase price, in the absence of proof of a contrary intention. The person advancing the consideration becomes the equitable owner the moment legal title passes to the named grantee. *Don-*

*aldson v. Greenwood,* 40 Wn. (2d) 238, 242 P. (2d) 1038 (1952); *Arneman v. Arneman,* 43 Wn. (2d) 787, 264 P. (2d) 256, 45 A. L. R. (2d) 370 (1953); Restatement, Trusts, § 440. Similarly, where property is transferred to one person and the purchase price is advanced by him as a loan to another, a resulting trust arises in the latter's favor. *Viner v. Untrecht,* 26 Cal. (2d) 261, 158 P. (2d) 3 (1945); Restatement, Trusts, § 448.

In the case before us, respondent testified that the consideration paid by him to the Radfords consisted of two things: (1) the note from appellant to the Radfords for $27,500, secured by a first mortgage on the building; and (2) a check for $27,500, drawn on the Rembe and McPhaden partnership account, representing part of the $60,000 loan to appellant secured by mortgages on his Mason county holdings and by a second mortgage on the Radford building. It is thus obvious that the entire consideration received by the Radfords consisted of appellant's cash and credit, and there is no doubt that appellant intended to buy the building for himself. It must follow that the evidence preponderates against the trial court's finding of fact No. 10, and that appellant became the equitable owner of the property immediately upon the transfer of legal title to respondent.

As equitable owner, appellant was entitled to a conveyance from the legal title holder without payment of any consideration. He, therefore, received no consideration whatever for so much of his promissory note to Rembe and McPhaden as promises to pay $5,000 plus a twelve and one-half per cent "premium" on $5,000. He did not receive this money in cash, and it was not applied to the Radford purchase. He is, therefore, entitled to judgment in the amount of $5,625.

As mentioned above, the purpose of the Rembe-McPhaden partnership was to lend money, usually on mortgage security. It is clear that respondent was not acting on behalf of the partnership in buying the building and reselling it at a personal profit. He was within the scope of his

partnership agency only in arranging the loan to appellant. Since the liability of one partner for the acts of his copartners is founded upon the principle of agency (*Melosevich v. Cichy*, 30 Wn. (2d) 702, 193 P. (2d) 342 (1948); RCW 25-.04.090), both partners and their wives should be held liable for the $625 "premium," but only respondent McPhaden and wife should be held liable for the $5,000 profit.

It should be mentioned that appellant failed, in his complaint, to allege facts showing a resulting trust, and the trial court granted respondent a running objection to all evidence not material to the allegation of express agency. However, Rule of Pleading, Practice, and Procedure 6(9), 34A Wn. (2d) 72, provides:

"At any time after trial, whether before or after judgment, the trial or appellate court may allow or make any amendment necessary to make a pleading conform to the proof, so far as may be just."

The right of the trial court or this court to consider the pleadings amended under this rule is not dependent upon whether or not objection was made to the testimony. *Quist v. Zerr*, 12 Wn. (2d) 21, 120 P. (2d) 539 (1941); *Keisel v. Bredick*, 192 Wash. 665, 74 P. (2d) 473 (1937). We have previously applied the rule to allow an amendment to conform to proof of a resulting trust where different facts were stated in the pleadings. *Smith v. Fitch*, 25 Wn. (2d) 619, 171 P. (2d) 682 (1946). In any event, the evidence as to the source of consideration paid in this case was properly before the court as material to the question of express agency, and respondent could not have been surprised by testimony which he himself supplied.

The judgment is reversed, and the cause is remanded with directions to enter judgment for appellant against respondents Rembe and McPhaden, and their respective marital communities, in the amount of $625, and against respondent McPhaden, and his marital community, in the additional amount of $5,000, with interest on the respective amounts

at the rate of six per cent per annum from August 25, 1953, until paid.

It is so ordered.

MALLERY, SCHWELLENBACH, WEAVER, and OTT, JJ., concur.

June 6, 1957. Petition for rehearing denied.