[No. 5388–II.   Division Two.   January 15, 1982.]

RICHARD F. NUTTALL, *Appellant*, v. GERALD L. DOWELL, ET AL, *Respondents.*

*Robert C. Randolph,* for appellant.

*Thomas L. Meyer, Donald E. Kelley,* and *Roy F. Kussmann,* for respondents.

*Kenneth O. Eikenberry, Attorney General, Thomas L. Boeder, Senior Assistant,* and *Jon P. Ferguson, Assistant,* amici curiae.

PEARSON, J.—This appeal revolves primarily around the construction of the Consumer Protection Act (CPA), RCW 19.86.010 *et seq.,* and its relationship to RCW 18.85.010 *et seq.* (Broker's Act), governing the conduct and licensing of real estate agents and brokers. The trial judge, sitting without a jury, found only a small portion of plaintiff's claim to be cognizable under the CPA and awarded dam-

ages and attorney's fees accordingly. Plaintiff appealed. The cross appeal of defendants Dowell has been dismissed.

Defendant Harold Schwartz is the owner of West Coast Properties, a registered real estate corporation located in Pierce County. He is a licensed real estate broker and owns an escrow company. In addition to these enterprises, Schwartz is a speculator engaged in the business of buying and selling real estate for profit. He and the other two codefendants, Gerald Dowell, an accountant, and Lester Dowell, an airline pilot, jointly owned the tract of land at issue on this appeal—the "Holly 40."

The Holly 40 is a 40–acre parcel of undeveloped land in Kitsap County. Defendant Schwartz has had considerable experience in buying and selling the Holly 40. In 1969, he was the real estate agent for Alpine Evergreen Company when Alpine sold the tract to the Collars. When the Collars decided to sell the land in 1973, Schwartz again was the agent in that sale to the Dowells. In September of 1974, the Dowells and plaintiff, Richard Nuttall, entered into a contract for the sale of the Holly 40. Although Schwartz was a partner of the Dowells and had acquired a one–third interest in the Holly 40, he was not listed as an owner of record nor does his name appear as a seller in the contract with Nuttall.

The purpose of the defendants in purchasing the Holly 40 was to divide the tract into smaller, 5–acre parcels for resale. Although Schwartz and the Dowells knew the Holly 40 had not previously been surveyed or subdivided, they had no intention of conducting a survey prior to their resale efforts because of the high cost entailed. Instead, defendant Schwartz gathered some boundary information from a survey map of the county road which ran through the northern portion of the Holly 40 and information from land to the east which had been surveyed. By process of elimination, Schwartz determined what he thought to be fairly accurate demarcations.

Schwartz apparently relied most heavily, however, upon what the previous owners of the Holly 40 had established as

the boundaries. Schwartz, when testifying as to the accuracy of his determination of the western boundary line of the land, stated:

> That was the existing line as marked, and that was the line that Mr. Collar thought was his property line and the line that Alpine Evergreen thought was their property line, and the line that the Dowells and myself had no reason to doubt, that it was relatively close.

Defendant Schwartz sold the 20 acres comprising the eastern half of the Holly 40 to Kitsap County, then proceeded to divide the remaining 20 acres of the western half into four equal parcels of 5 acres each.

In preparation for the resale of these four parcels of land, Schwartz marked the northern boundary line with surveyor's ribbons. The western boundary line was already visibly marked with stakes and surveyor's ribbons which had been placed there some years before by a forester from Alpine Evergreen as part of a logging operation. Thus, Schwartz renewed what he thought to be a reasonably accurate boundary with at least one surveyor's ribbon in order to make the west boundary line more visible to prospective purchasers. Using a corner on the western line as the starting point, Schwartz also marked off the interior lot corners, which he based on the usual dimensions for 5–acre parcels—330 feet by 660 feet.

The two lots comprising the northern portion of this 20–acre parcel, lot 1 in the northwest quadrant and lot 2 in the northeast quadrant, bordered on the county road, thereby making access readily available. Lot 7, in the southwest quadrant, and lot 8, in the southeast quadrant, were directly adjacent and below lots 1 and 2. These southernmost parcels had no separate access to a road for purposes of ingress and egress, thus making an easement over lot 1 or 2 necessary.

At the time of the sale to Nuttall, Schwartz, through his corporation West Coast Realty, acted as agent and broker for the sale of the property on behalf of himself and the Dowells. The Dowells signed a listing agreement granting

authority to Schwartz and West Coast to show and to sell the Holly 40 parcels. The listing agreement stated that the boundary lines were flagged, which meant that West Coast could represent to prospective purchasers that the lines were "more or less" accurate. As used by West Coast Realty, the term "more or less" denotes a range of tolerable error of approximately 1 percent. Defendant Schwartz testified that an allowable error for boundary lines in a 5–acre parcel would be 5 feet or less.

Schwartz and West Coast advertised to the public the sale of 5–acre parcels of wooded land. After seeing a "For Sale" sign on the property displaying West Coast Realty's telephone number, plaintiff, Richard Nuttall, telephoned West Coast to inquire about the availability of the property.

Nuttall made an appointment at the property site with a real estate agent employed by West Coast. Nuttall and the agent walked the property and the flagged western boundary line was represented as being accurate within "a couple of feet at the most." After viewing the property and talking to the real estate agent, Nuttall became interested in purchasing the two parcels which comprised the western half of the acreage tract, lot 1 and lot 7.

Nuttall then met with defendant Schwartz at the West Coast office. Their conversation involved the prices and the financing available for the two lots. Plaintiff, concerned about the exactness of the boundary lines, questioned Schwartz. Schwartz informed Nuttall that the property had not been legally surveyed, but confirmed the accuracy of the boundaries as previously represented by his real estate agent. Schwartz suggested to Nuttall that he could check these representations with the previous owner, Alpine Evergreen. Nuttall did so, and Alpine Evergreen confirmed the probable accuracy of the boundaries and gave plaintiff a copy of a map of the Holly 40, which Nuttall, in turn, gave to Schwartz for his information.

Plaintiff entered into two real estate contracts for the purchase of lot 1 and lot 7. Lot 1 was made subject to an

easement for purposes of ingress, egress, and utilities for the benefit of an otherwise landlocked parcel, lot 8 in the southeast quadrant. The easement which plaintiff's estate was to contribute was 15 feet along the eastern boundary. Nuttall's neighbors to the east, who had already purchased lot 2 on a similar real estate contract, had granted 15 feet of their western boundary for purposes of the road. These two 15–foot portions of lots 1 and 2 were to form the easement road for lot 8. As partial consideration for the second contract on lot 1, plaintiff was to construct this easement road for a discount of $500 on the purchase price of lot 1.

Plaintiff then began working on his property in preparation for his permanent living arrangements. Nuttall first cleared some land and built a small log cabin. The cabin was to provide temporary living quarters while plaintiff cut timber and sawed his own lumber to use in building a home. Nuttall also dug a well by hand, cleared the proposed site for his permanent home, and cleared and constructed a road leading into the homesite.

After plaintiff had lived on his land for a while, Schwartz, rather than conduct a costly legal survey, attempted to ascertain the precise location of the easement road in order to have Nuttall begin the building and grading of the road. Nuttall then carried out his agreement with defendants and constructed the easement road where Schwartz had located it.

After all these events occurred, Nuttall's neighbors to the west conducted what all the parties agree was a more accurate survey of the western boundary line. As a result, plaintiff's proper western boundary has moved approximately 130 feet east of where it was originally represented to be, thus placing Nuttall's well and proposed homesite on neighboring land to the west. The ripple effect of this dislocation has caused the easement road to lie entirely on plaintiff's land, thereby isolating approximately one–half acre of Nuttall's property which is now located to the east of the road. The proper relocation of the boundary line has also resulted in the diminution of Nuttall's acreage to 9

instead of the 10 acres which he had contracted to purchase. Another incidental effect of this boundary relocation has been to foment disputes between Nuttall and his neighbors to the east and west.

The only incident which the trial court found compensable under the CPA was the initial acreage misrepresentation by defendants. The trial court awarded plaintiff $1,400 in damages against all defendants to compensate for the loss of 1 acre of land caused by their unfair or deceptive act of misleading advertising.

Even though all parties agree that the west boundary as represented to Nuttall was grossly inaccurate, the trial court did not view this as a CPA violation. The court's reasoning is not clearly enunciated in the record, but what is clear is that in making the determination, the trial judge focused on the fact that Nuttall did not rely entirely on Schwartz' location of the line, but made an independent investigation of the accuracy of the boundaries by contacting a previous owner. Even though the lower court found that Nuttall had been damaged in the amount of $930, representing the value of Nuttall's labor in clearing the land and the loss of the well, the trial judge refused to place liability upon the defendants. The basis for this decision appears to be either (1) Schwartz' misrepresentation of the location of the western line was not a violation of RCW 19.86.020, *i.e.*, was not an unfair or deceptive act, or (2) the causal connection between Schwartz' misrepresentation and plaintiff's injury had been broken by Nuttall's own independent investigation.

The trial court found that defendant Schwartz acted negligently and incompetently in attempting to locate the eastern boundary for the easement road. Damages of $1,900, representing the cost of having the easement road properly relocated, were assessed against Schwartz but not against his partners, the Dowells. However, plaintiff's CPA claim for this incident was denied, because, in the court's opinion, this was an isolated transaction between private parties, and as such was not embraced by the act.

The trial court further refused to find that the conduct of defendant Schwartz violated certain prohibitions contained in the act regulating the conduct of real estate brokers, RCW 18.85.230. The import of this decision was to negate plaintiff's argument that all the actions of defendant Schwartz were illegal and contrary to public policy and capable of forming a sufficient basis from which a per se violation of RCW 19.86.020 may attach.

In awarding reasonable attorney's fees to the plaintiff pursuant to RCW 19.86.090, the trial judge limited the award to only that portion of plaintiff's action which was cognizable under consumer protection, *i.e.*, the acreage misrepresentation. The judge recognized that this portion of plaintiff's claim entailed only a very small part of the attorney's services and efforts and that the "vast majority of the case was spent on the boundary line problems." The judge awarded $1,400 reasonable attorney's fees, thus denying plaintiff his request for a $25,000 award to compensate his attorneys for their efforts in the entire litigation.

Additionally, plaintiff's request for costs not ordinarily recoverable under our general statutory costs provision, RCW 4.84.090, was denied. Although the trial court recognized that it might possess authority to award these extraordinary costs under the CPA provision, RCW 19.86-.090, the court chose to award the plaintiff only $300 in ordinary costs and refused to award requested costs of $1,200. The reasons behind this action were the same as the reasons behind the award of attorney's fees—the successful CPA claim was a minor part of the entire litigation.

On appeal, the plaintiff and the Attorney General, who is appearing as amicus curiae in this action, seek to establish Schwartz' inaccurate location of the western boundary and the easement road as either unfair or deceptive acts or practices contrary to RCW 19.86.020, or as illegal and contrary to the public policy of the Broker's Act, RCW 18.85-.010 *et seq.*, hence forming a per se violation of RCW 19.86.020. Nuttall also seeks to impose liability on the

Dowells for the easement road incident and requests reversal of the trial court's conclusion that no agency relationship existed between Schwartz and the other two partners at the time of this incident. Furthermore, Nuttall urges us to find that the trial court abused its discretion in the award of attorney's fees and costs under RCW 19.86.090.

Upon viewing Schwartz' conduct in this single land transaction in light of the trial court's findings of fact, we conclude that the judgment should be affirmed as to the Consumer Protection Act issues. However, we hold that the Dowell defendants are jointly and severally liable with Schwartz for his mislocation of the easement road.

The judgment should be modified accordingly.

## I
### CONSUMER PROTECTION

■ The Washington Supreme Court has recently held that the regulation of real estate transactions pursuant to the Broker's Act, RCW 18.85.010 *et seq.*, is not exempted from antitrust liability unless the action complained of is specifically permitted by the regulating agency. *In re Real Estate Brokerage Antitrust Litigation,* 95 Wn.2d 297, 622 P.2d 1185 (1980); *State v. Tacoma–Pierce County Multiple Listing Serv.,* 95 Wn.2d 280, 622 P.2d 1190 (1980). This act, along with WAC 308–124, regulates the licensing of real estate brokers and salespersons. Minimum standards of conduct for those engaged in this occupation are set out in RCW 18.85.230, which authorizes the Director of Licensing to revoke, suspend, or deny a license if these standards are violated. Furthermore, the statute regulates the conduct of brokers and agents "regardless of whether the transaction was for his own account or in his capacity as broker". Violation of any provision contained in RCW Title 18 is a gross misdemeanor. RCW 18.85.340.

■ A per se violation of RCW 19.86.020, declaring unfair or deceptive acts or practices in the conduct of any trade or business to be unlawful, is established when an act or practice is found to be in violation of the law and con-

trary to public policy as declared by the legislature or judiciary. *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 581 P.2d 1349 (1978). The public interest or public policy element of a CPA violation was first written into RCW 19.86.020 by *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 501 P.2d 290 (1972), requiring an act within the marketplace to be illegal and contrary to public policy before a per se violation may be found. This requirement was expanded upon in two subsequent cases, *Lightfoot v. MacDonald*, 86 Wn.2d 331, 544 P.2d 88 (1976), firmly establishing the public interest requirement based upon the reasoning behind the Federal Trade Commission Act, 15 U.S.C. § 45 (which, unlike our state act, does not provide for private enforcement); and *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980), elucidating the test which the judiciary must use to determine whether a defendant's act sufficiently affects the public interest before being cognizable under the law of consumer protection.

With the background of this state's public interest requirement of the CPA in mind, we now turn to the question whether defendant Schwartz' conduct as a real estate broker in this single land sale transaction with plaintiff Nuttall can be found to be (1) illegal or unlawful *and* (2) contrary to public policy as declared by the legislature or judiciary, hence establishing a violation of RCW 19.86.020.[1] We first address the public policy requirement.

The Broker's Act does not specifically provide that commission of a prohibited act shall be a violation of the Consumer Protection Act, RCW 19.86.020. *Compare* RCW 19.16.440, governing collection agencies, *and* RCW 46.71-.070, governing automotive repairs. Nor does this act contain an express declaration that the public interest is involved in the licensing of real estate brokers and agents,

---

[1]The interpretation and application of a statute to a particular factual configuration is treated as a question of law, hence reviewable by an appellate court. *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 285, 525 P.2d 774 (1974); *Rusan's, Inc. v. State*, 78 Wn.2d 601, 607, 478 P.2d 724 (1970).

as does for example, RCW 48.01.030 declaring that the insurance business is one affected by the public interest. *Salois v. Mutual of Omaha Ins. Co., supra.*

■ However, an examination of the regulatory and licensing scheme of RCW Title 18 makes it apparent that the welfare of the general public is implicated by the primary purpose underlying the act—to promote a minimum standard of conduct for those engaged in the business of real estate who are often conducting their business in the capacity of a fiduciary. In short, the purpose of the Broker's Act is to protect the general public from negligent, unscrupulous, or dishonest real estate operators. *State v. Waymire,* 26 Wn. App. 669, 614 P.2d 214 (1980); *Ellestad v. Swayze,* 15 Wn.2d 281, 130 P.2d 349 (1942).

Specifically prohibited by RCW 18.85.230(9) is continuing to sell real estate according to a plan of selling which endangers the interests of the public, once the Director of Licensing has objected to the plan. RCW 18.85.343 authorizes the Director to issue a temporary cease and desist order where the public interest might be irreparably harmed by any delay. Enforcement powers are given to the county prosecuting attorneys and the Attorney General under RCW 18.85.350. The fact that these powers are given to officers charged with protecting the public welfare is further evidence that the Broker's Act is designed to foster and protect the interests of the State from the misconduct of those engaged in these special, licensed occupations. Thus, if acts of this real estate broker during this single land transaction are found to be illegal or unlawful, the interest of the public in preventing this pattern of conduct is apparent.

Nuttall contends that defendant Schwartz, who the trial court found to be acting in his legal capacity as real estate broker in all three instances of alleged misconduct, violated some of the 29 subsections of RCW 18.85.230. RCW 18.85-.340 provides that any person acting as a broker or agent in violation of any provisions contained in RCW 18.85 shall be guilty of a gross misdemeanor. An illegal act is an act which

is contrary to statutory authority. *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974); *Mobil Oil Corp. v. Reynolds*, 202 Kan. 179, 446 P.2d 715 (1968). Thus, if the plaintiff can establish that defendant Schwartz' conduct violated the provisions of RCW 18.85.230, the remaining prong of the 2–part *Salois* test for a per se violation of RCW 19.86.020 will be satisfied.

RCW 18.85.230 provides, in part, that the following acts are grounds for disciplinary action against a broker:

> (5) Knowingly committing, or being a party to, any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme or device whereby any other person lawfully relies upon the word, representation or conduct of the licensee;
>
> . . .
>
> (26) Any conduct in a real estate transaction which demonstrates bad faith, dishonesty, untrustworthiness or incompetency . . .

Nuttall challenges the trial court's failure to find that the improper western boundary line representation by Schwartz violated subsection (5) and that the negligence and incompetence displayed by defendant in mislocating the easement road violated subsection (26).

The trial court found that defendant Schwartz acted incompetently and negligently in fixing the location of the easement road on the eastern boundary of Nuttall's lot. As noted above, the court imposed liability for this negligence on defendants Schwartz and West Coast Realty, but refused to find this to be either an unfair or deceptive act or a violation of RCW 18.85.230.

### A
#### WESTERN BOUNDARY

We disagree with Nuttall's contention that defendant Schwartz violated RCW 18.85.230(5) by the location of the western boundary. The thrust of subsection (5) appears to be aimed at controlling intentional deception by a broker while acting in his licensed capacity. The words *knowingly*

*committing* coupled with the import of the subsequent words of the statute, *collusion, trick, scheme, device,* all denote the elements of intentional deceit. The other major requirement of subsection (5) is a finding that the person so deceived lawfully relied on the broker's misconduct.[2]

The trial court found that Nuttall did not rely on Schwartz' word as to the accuracy of the location of the western boundary line, but conducted his own investigation by discussing the property and its history with a prior title holder, Alpine Evergreen, to whom he was referred by Schwartz. Thus, the trial court was warranted in concluding there was no violation of RCW 18.85.230(5), and, therefore, no per se violation of the CPA. Additionally, plaintiffs contend (1) there was insufficient evidence to support the trial court's finding of nonreliance, and (2) in any event consumer reliance is not a requisite to a CPA violation. The evidence set forth above is sufficient, however, to support the trial court's finding that plaintiff did not rely upon defendant's representations concerning the western boundary line.

We agree in general with amicus that consumer reliance need not be shown to establish that a misrepresentation is unfair or deceptive so long as it has a capacity or tendency to deceive. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 553 P.2d 423 (1976). This principle would and should apply to any action which seeks to enjoin or otherwise deter CPA misconduct, *e.g.,* where the Attorney General sues to enforce the CPA on behalf of the public generally.

■ But this is a private action in which plaintiff seeks recovery of damages and, as such, he must establish some causal link between defendant's unfair act and his injury.

---

[2]RCW 18.85.230(4), prohibiting the negligent dissemination of false representations that could have been seen as likely to induce reliance, might have provided a theory of recovery for certain of Schwartz' actions in this case. That subsection was not argued to the trial court or to this court, however, and we decline to apply it sua sponte.

On its face, RCW 19.86.090 requires that a consumer must first be injured by an antitrust violation before actual damages are compensable under the CPA.

Not only does the statutory scheme require this connecting link, but such link also is found in the *Anhold* test for the public interest requirement under the CPA. The court in *Anhold* characterizes the test as an inducement offered by the defendant, which has the effect of either producing action or inaction on the part of plaintiff resulting in injury and damage. *Anhold v. Daniels,* 94 Wn.2d at 46.

The federal courts view antitrust violations as tortious and use a proximate cause analysis. *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 28 L. Ed. 2d 662, 91 S. Ct. 1377 (1971); *Haverhill Gazette Co. v. Union Leader Corp.,* 333 F.2d 798, 802 n.3 (1st Cir.), *cert. denied,* 379 U.S. 931, 13 L. Ed. 2d 343, 85 S. Ct. 329 (1964). However, the plaintiff's burden of proof on the fact of damage is lessened somewhat in recognition of the importance of the public policy that the federal statutes seek to serve and the desire to induce private persons to act as enforcing agents. 6 H. Toulmin, *Antitrust Laws* § 27.3 (1951).

Despite the lessened burden of proof, the trier of fact must still find that a CPA violation resulted in or caused the damages for which plaintiff seeks recovery. Here, on conflicting evidence, the trial court found that plaintiff did not rely upon defendant's representations relating to the western boundary but investigated the boundary independently. As stated above this finding is supported by substantial evidence. We hold that a party has not established a causal relationship with a misrepresentation of fact where he does not convince the trier of fact that he relied upon it. Accordingly, the trial court's conclusion was correct that plaintiff did not establish a claim under the CPA based upon defendant's representation concerning the western boundary line.

## B
### Easement Road Mislocation

With reference to the easement road mislocation the trial court allowed breach of contract damages but declined to apply the CPA. The trial court's rationale was that the CPA should not apply to an isolated, after–the–fact breach of private contract. We agree with this rationale where the breach of contract was not done in bad faith or does not constitute a violation of the law. *Salois v. Mutual of Omaha Ins. Co., supra.* We decline to accept plaintiff's argument that the broker's "incompetence" in locating the easement road establishes a violation of RCW 18.85-.230(26). The term "incompetence" in that statute obviously relates to conduct of a broker or salesman pertaining to the real estate transaction itself and not to the actions of a coowner in attempting to fulfill a contractual obligation. We conclude that breach of contract damages were properly awarded to plaintiff and the trial court was correct in refusing to apply the CPA.

## II
### Agency

The trial court found defendant Schwartz and Lester and Gerald Dowell to be joint owners of the Holly 40. The trial court held that Schwartz and West Coast acted as agents in all the boundary and acreage representations, but concluded that since the Dowells did not actively participate in the location of the easement road, the liability for the breach of one partner could not be imputed to the entire partnership. We disagree.

Our disagreement rests upon Schwartz' status as a joint adventurer engaged in the enterprise of buying, dividing, and reselling land. All three defendants recognized and characterized their relationship as one of "partnership which had as its business the purchase and sale of real estate." No evidence was offered at trial to negate the inference that Schwartz had the authority to make each and every representation presented to Nuttall during this

entire land transaction. In fact, Lester Dowell conceded at trial that he and his brother left all the details to Schwartz. It is apparent that the Dowells, one an airline pilot and the other an accountant, considered Schwartz as a real estate expert who possessed the relevant knowledge, resources, and expertise needed to implement this partnership venture. ·

■ Under RCW 25.04.130 a partner is bound by the wrongful act or omission of any partner acting in the ordinary course of business. This vicarious liability applies to contractual liability. *Mading v. McPhaden,* 50 Wn.2d 48, 308 P.2d 963 (1957).

At the time of Schwartz' misconduct, he was engaged in furtherance of the partnership business and was acting pursuant to the agreement between the plaintiff and the partnership, which had previously been acknowledged and agreed to by all the members. Furthermore, the partners testified that they never had any intention of conducting a survey on the Holly 40. The clear inference is that the Dowells were fully aware of the situation and assumed, as they had in the entire transaction, that Schwartz, with his superior expertise, would locate the easement road, just as he had done with the boundaries. Hence, the Dowells are vicariously liable to plaintiffs for Schwartz' attempted performance of a contractual obligation. The judgment should be modified accordingly.

### III
#### ATTORNEY'S FEES AND COSTS

Nuttall claims that the trial court abused its discretion by limiting the award of attorney's fees allowable under RCW 19.86.090 to the precise amount of damages compensable to Nuttall under his successful CPA claim, *i.e.,* $1,400 for the acreage misrepresentation. Counsel also argues a similar abuse when the trial court limited the costs recoverable under RCW 19.86.090 to those allowed under the general cost statute, RCW 4.84.090, rather than awarding the full amount of plaintiff's extraordinary costs, totaling

approximately $1,200.

■ The amount of an award for attorney's fees and costs pursuant to RCW 19.86.090 is a decision vested in the trial court's sound discretion. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 553 P.2d 423 (1976). This decision will not be overturned absent a clear showing that the trial court's decision was manifestly unreasonable, exercised on untenable grounds, or for untenable reasons. *Marketing Unlimited, Inc. v. Jefferson Chem. Co.,* 90 Wn.2d 410, 583 P.2d 630 (1978). An abuse of discretion is never presumed. *Abel v. Abel,* 47 Wn.2d 816, 289 P.2d 724 (1955).

Nuttall argues that the only factor the trial court considered was the damage award to the plaintiff, and that the court felt constrained to limit the fee award to no more than the figure recoverable as damages. However, it is clear from the trial court's conclusion of law that the plaintiff is not entirely correct. The court concluded that "[r]easonable attorney's fees are recoverable for that portion of the presentation of this case which related to the issues found cognizable under the Washington Consumer Protection Act." This conclusion was articulated in the trial court's oral opinion, and is supported by the judge's statement that "the vast majority of the case was spent in the boundary line problems," which the court had determined to be outside the scope of the CPA.

The trial court's conclusion to award only those fees attributable to a successfully litigated CPA violation is amply supported by the law. Washington has held that the trial court may, in its discretion, allocate fees to only those claims litigated successfully. *Holland v. Boeing Co.,* 90 Wn.2d 384, 583 P.2d 621 (1978). Federal antitrust law also recognizes that the time devoted to unsuccessful claims may not be compensable. *Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.,* 480 F. Supp. 1195, 1197 (S.D.N.Y. 1979). However, to the extent that the attorney's time is applicable to both unsuccessful and successful claims, it is properly includable. *Id.*

Nuttall also contends that the award of attorney's fees did not reflect the factors set forth in (CPR) DR 2–106(B),[3] that the refusal to use the "Lindy Formula" in this action was unreasonable,[4] and that a small fee award runs contrary to CPA policy of encouraging private enforcement.

Counsel has launched a general attack on the trial court's decision and has failed to show that the fee award was not proper given the admittedly small portion of plaintiff's claim successfully litigated under consumer protection. Furthermore, we find it unreasonable in the circumstances that plaintiff's counsel should seek not only the full amount of his fees for his efforts in this entire litigation, nearly $25,000, but seeks to have this amount increased by a multiplier which would impute to counsel an unwarranted measure of extraordinary skill and would reward the supposed completeness with which he briefed and argued this novel consumer protection issue.

While we agree the case was complex, it was made so by counsel's exaggerated efforts to establish a Consumer Protection Act case when the facts were marginal at best. We therefore affirm the award of attorney's fees and allow an

---

[3]Factors to be considered as guides in determining the reasonableness of an attorney's fees are set forth in (CPR) DR 2–106(B) as follows:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent."

[4]The "Lindy Formula" originated in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). It is used increasingly in Ninth Circuit antitrust cases. *Knutson v. Daily Review, Inc.*, 479 F. Supp. 1263 (N.D. Cal. 1979). Essentially, it allows a court to increase counsel's actual fees by a multiplier which is based on a showing of counsel's extraordinary competence on a novel or complex issue.

additional $500 for the single issue on which plaintiff prevailed on appeal.

The trial court's exercise of discretion in awarding $300 in costs, rather than the $1,200 which plaintiff sought, is clearly reasonable under the circumstances.

Affirmed as modified.

REED, C.J. (concurring specially)—I concur with my brother, Pearson, J., but believe a caveat is justified. My concern is that this opinion not be taken for authority or precedent that the provisions of the Consumer Protection Act apply without question to the transaction here involved. Had there been a cross appeal on this issue, supported and opposed by competent and thorough briefing on both sides, we could have addressed the issue squarely, and properly resolved it.

To me, this was a common, run–of–the–mill sale of Blackacre. The sellers, apparently innocently but negligently, misrepresented the true lines and thus the acreage. Innocent or not, the misrepresentation damaged Nuttall and rendered sellers liable. Nuttall could be fully compensated by the usual common law remedies. If not settled, his claims could have been litigated with a modicum of effort by the application of "black–letter" law, and with few complications or subtleties.

Merely because one joint owner happened to be a broker should not convert his mistakes into something insidious— a deceptive act or practice, triggering the penalties and attorney fee provisions of the CPA.

PETRIE, J. (dissenting)—I am forced to dissent from the generally well–reasoned opinion of the majority. A claimant seeking imposition of civil penalties as authorized by RCW 19.86.140 need not prove consumer reliance to establish an unfair or deceptive practice. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 317, 553 P.2d 423 (1976); *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 51, 554 P.2d 349, 83 A.L.R.3d 680 (1976).

I would reverse the judgment, impose penalties (at least) for the western boundary deceptions, and substantially increase the attorney fees.

Reconsideration denied February 9, 1982.

Review denied by Supreme Court May 7, 1982.