# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82529-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| CLA ESTATE SERVICES, INC., and CLA USA INC., | PUBLISHED OPINION |
| Appellants, | |
| MITCHELL REED JOHNSON, individually and in his marital community, | |
| Defendant. | |

SMITH, A.C.J. — CLA Estate Services, Inc. (CLA ESI) and CLA USA, Inc. (CLA USA) (collectively, CLA) began offering free estate-planning seminars for seniors in Washington in 2008. These seminars stressed to consumers that "Revocable Living Trusts" (RLTs) were a superior means of estate distribution relative to probate, and offered a "Lifetime Estate Plan," wherein nonlawyer CLA agents would come to consumers' houses and gather information about the consumers' assets to assist the consumers' lawyers in preparing their estate distribution documents. The Office of the Attorney General (AGO) sued CLA for violations of the Consumer Protection Act (CPA), ch. 19.86 RCW, and "Estate Distribution Documents Act" (EDDA), RCW 19.295. After motions for summary judgment and a bench trial, the court concluded that CLA unlawfully

No. 82529-1-I/2

misrepresented the benefits of RLTs compared to probate, misrepresented the CLA agents' intentions in coming to consumers houses, and violated the EDDA by gathering information for the preparation of estate distribution documents. The court ordered CLA to pay restitution for all of the commissions it received from the sales of the Lifetime Estate Plan and annuities sold at in-home meetings, and imposed a civil penalty of $2,000 per violation. CLA appeals. Finding no error, we affirm.

FACTS

CLA ESI and CLA USA are Texas corporations that began offering free estate-planning seminars in Washington in 2008, offering a free meal to seniors to encourage attendance. At these seminars, CLA's presenters, who were not lawyers, distributed and taught from a workbook titled "CLA 'Lifetime Estate Plan.' " The presenters followed scripts promoting the Lifetime Estate Plan and "focus[ing] on the supposed dangers associated with probate that could be avoided with a living trust." The plan was "tout[ed] as a full-service estate planning package in which CLA would assist consumers in estate planning to protect their assets and heirs, ensure their estate passes to their heirs, provide access to attorneys to draft estate documents, and support and coordinate the work of the attorneys." As part of the plan, CLA would gather information about the consumers' estates and enter it into its "Road of Retirement" proprietary software, and share this information with the consumers' independent attorneys for the preparation of estate distribution documents. CLA would then send an agent to the consumers' house in a "delivery meeting" to deliver and notarize the

2

No. 82529-1-I/3

legal documents. Then, three months later and every year thereafter, CLA would send an agent to review the client's information and check if any changes were needed.

Although these agents were presented as being "financial planners" who could offer a wide variety of advice and help, the agents were insurance salespeople whose primary compensation for these visits was commissions from selling annuities. And "[a]lthough CLA agents represented to consumers that the Road of Retirement's purpose was to gather information for estate planning purposes, CLA expected its agents to use the Road [of] Retirement as a sales tool, to gather lists of assets that could be moved into annuity products." The insurance products that CLA sold were "extraordinarily complex" and "opaque," included an "extraordinarily" high commission relative to other insurance products, and were calculated by an expert as having a substantially lower value than the purchase price.

The AGO issued a Civil Investigative Demand (CID) to CLA in 2013, when it began to investigate whether CLA's business model complied with the CPA and EDDA. In October 2017, the AGO provided CLA with notice of its intent to sue for violations of these acts.[1] The court decided several motions for partial summary judgment and ultimately entered findings of facts and conclusions of law following a bench trial. It concluded that CLA violated the CPA by misrepresenting the relative benefits of RLTs and probate in Washington and by being deceitful about the intentions of the CLA agents sent to in-home visits. It

_____

[1] The record does not establish why the AGO's investigation took 4 years.

3

also concluded that CLA violated the EDDA by offering to gather, and gathering, information from clients for the preparation of estate distribution documents. It ordered CLA to return all revenue from sales of the Lifetime Estate Plan and insurance products to consumers in Washington and imposed civil penalties of $666 to $2,000 for each CPA and EDDA violation. It also entered extensive injunctive restraints against CLA and awarded attorney fees to the AGO.

CLA appealed.

ANALYSIS

Standard of Review

We review the court's findings of fact to determine if they are supported by substantial evidence in the record. Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co., 150 Wn. App. 1, 8 n.5, 206 P.3d 1255 (2009). We then determine whether the findings of fact support the conclusions of law. Id. Whether a certain action constitutes a violation of the CPA is a question of law that we review de novo. Id. at 12.

"A trier of fact has discretion to award damages which are within the range of relevant evidence." Mason v. Mortg. Am., Inc., 114 Wn.2d 842, 850, 792 P.2d 142 (1990). "An appellate court will not disturb an award of damages made by the fact finder unless it is outside the range of substantial evidence in the record, or shocks the conscience, or appears to have been arrived at as the result of passion or prejudice." Id.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Representations about Trusts and Probate

CLA contends that the court erred when it concluded that CLA misrepresented estate law and that these misrepresentations violated the CPA. It challenges several individual findings[2] about the contents of CLA's workbooks and challenges the court's legal conclusions about the net impression made by CLA at the seminar. These issues are discussed in turn.

1. Challenged Findings

CLA challenges the portion of the court's Finding of Fact 12(d) that states that page 11 of the CLA workbook "graphically represent[s] that the probate process significantly reduces the estate value available to distribute to heirs." Page 11, which is titled "PROBATE" depicts a large box labeled "Your Estate," with several enumerated costs ("Attorney → Judicial Supervision → Executor → Appraisals →



Court Clerks"), and then depicts arrows pointing at a significantly smaller box labeled "HEIRS." This is substantial evidence supporting the court's finding.[3]

---

[2] In its reply brief, CLA also contends for the first time that the court uncritically accepted the State's proposed findings and conclusions and that we should therefore closely scrutinize those findings. But the court did not adopt verbatim the State's proposed findings and its findings stand up to scrutiny.

[3] CLA challenges this finding rather disingenuously by omitting the word

5

No. 82529-1-I/6

CLA challenges Finding of Fact 12(e)'s characterization of the quotes on page 12 of the workbook as "vastly overstat[ing] the general cost of probate administration in Washington." CLA makes its argument by characterizing the court's finding as referring to CLA's statements, and then contending that CLA's only claim about the cost of probate was "who knows." But the court's finding



plainly concerns the "statements" providing specific numbers, ranging from 4 to 6 percent of an estate to "MORE THAN 7%." And the court cites a declaration from the State's expert that the page "both wrongly implies that Washington does have a percentage-based statutory fee schedule and, in my experience, dramatically overstates the cost of probate administration." Additional evidence indicates that the workbook's actual dollar estimate of the cost of probate "is far in excess of the typical cost of probate." Rather than challenging the reliability of this evidence, CLA points to its own expert's declaration highlighting the uncertainties of probate costs, but ultimately presenting evidence that the average probate cost in 100 probate cases in Western Washington was 3.77 percent of the estate value. Given that the page's first estimation of probate

---

"graphically" from its assignment of error and then protesting that page 11 does not "state or imply a dramatic reduction."

6

costs is "MORE THAN 7%" of the estate value, we conclude that substantial evidence supports the court's finding that this "vastly overstate[s]" the cost of probate.

Page 13 of the workbook characterizes probate cost as being "4-7%" of probatable assets.  We therefore similarly uphold Finding of Fact 12(g), that this characterization "significantly overestimates" the cost of probate in Washington.



CLA challenges Findings 12(f), (h), and (i), which discuss the claims on Page 13 about the time, public nature, and amount of control involved with probate.  It claims that, whereas the court's findings indicate that revocable living trusts suffer from the same potential problems as probate, (1) the page "stands on its own," (2) the information on the page is correct, and (3) RLTs are superior to probate in those areas.  But the first two points do not contradict anything in the court's findings.  And to make the third point, CLA relies only on its own expert's testimony, failing to engage with the evidence cited by the court or to explain why it is insufficient.  CLA therefore

7

necessarily fails to show that the findings are unsupported by substantial evidence.[4]

CLA is correct in its challenge to Finding 12(k), that "CLA's workbook does not mention the use of durable powers of attorney," because the workbook does in fact do so. However, the workbook mentions it only in the context of a list of documents it will prepare and in explaining why it is not as effective as a revocable living trust. Finding 12(k) as a whole challenges the accuracy of CLA's claim that a revocable living trust will avoid guardianship and notes that durable powers of attorney are "the most common means of avoiding guardianship." Although the workbook does in fact mention the use of durable powers of attorney, it still paints revocable living trusts as the only effective way to avoid guardianship. We conclude that the challenged portion of Finding 12(k) is unsupported by substantial evidence but that this does not affect the trial court's conclusions of law. State v. Coleman, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018) (citing Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992)) ("Even if a trial court relies on erroneous or unsupported findings of fact, immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal.").

Finally, CLA challenges the court's Finding 13, that the workbook offers to "assist consumers in estate planning to protect their assets and heirs, . . . provide access to attorneys to draft estate documents, and support and coordinate the

---

[4] CLA's challenge to findings 12(l)-(n) follows the same logic as its challenge to these comparisons, and fails for the same reason.

8

work of the attorneys." CLA protests that it did not "coordinate or have any control over the work of attorneys" and "*never* promised to assist in estate planning to protect assets/heirs." But the workbook's explicit claims that CLA "[c]oordinates non-legal services along with legal services provided by independent attorneys into a Lifetime Estate Planning Package," "[c]oordinate[s], through an independent attorney, the implementation of the client's Estate Planning documents," and "[p]rovide[s] legacy planning solutions allowing client to transfer their estate to their heirs at life's end" all provide substantial evidence for this finding.

We hold that the court's finding in Paragraph 12(k), that "CLA's workbook does not mention the use of durable powers of attorney," is unsupported by substantial evidence but that this does not affect the conclusions of law. And we determine that all the other challenged findings are supported by substantial evidence.

2. Net Impression Generated by the Workbook

Next, CLA contends that the court misapplied the "net impression" doctrine and that its estate planning seminars were not deceptive. We disagree.

Under the CPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. "By broadly prohibiting 'unfair or deceptive acts or practices in the conduct of any trade or commerce,' the legislature intended to provide sufficient flexibility to reach unfair or deceptive conduct that inventively evades regulation." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 49, 204 P.3d 885 (2009) (citation omitted) (quoting

9

RCW 19.86.020). When "the Attorney General brings a CPA enforcement action on behalf of the State, it must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, and (3) public interest impact." State v. Kaiser, 161 Wn. App. 705, 719, 254 P.3d 850 (2011).

"While the CPA does not define the term 'deceptive,' the implicit understanding is that 'the actor misrepresented something of material importance.' " Id. (emphasis omitted) (quoting Hiner v. Bridgestone/Firestone, Inc., 91 Wn. App. 722, 730, 959 P.2d 1158 (1998)). The question is whether "the alleged act had the capacity to deceive a substantial portion of the public." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 785, 719 P.2d 531 (1986). "Even accurate information may be deceptive 'if there is a representation, omission or practice that is likely to mislead.' " Kaiser, 161 Wn. App. at 719 (quoting Panag, 166 Wn.2d at 50).

In Panag, insurance companies covered the expenses of their insureds after car accidents and then sought to pursue subrogation claims against the other drivers. 166 Wn.2d at 32-35. Rather than pursue these claims in court, they retained a collection agency that sent the drivers official-looking "collection notices," representing that there was an "AMOUNT DUE," advising the driver to "[a]ct immediately," and taking "increasingly urgent tone[s]" before threatening legal action. Id. at 35-36. The court concluded that the notices "were deceptive because they look[ed] like debt collection notices and may [have] induce[d] people to remand payment in the mistaken belief they [had] a legal obligation to do so." Id. at 47-48. This was despite the fact that the notices "accurately

10

No. 82529-1-I/11

state[d] the demand was related to a subrogation claim." Id. at 49-50. The court explained that "a communication may be deceptive by virtue of the 'net impression' it conveys, even though it contains truthful information." Id. at 50 (quoting Fed. Trade. Comm'n v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006).

Here, the presentations and workbooks at CLA's seminar gave the deceptive net impression "that a revocable trust is preferable regardless of individual circumstances." The court found that the workbook gives the impression that wills lead to "WORRY," while trusts lead to "PEACE OF MIND," based on the workbook's representation that wills are subject to court control, are public, take a long time to resolve, and leave families vulnerable, while trusts avoid all these issues. The court found that this impression was deceptive because it "misrepresents Washington law, the Washington probate process, and the relative benefits of revocable living trusts in Washington." As discussed above, these findings are supported by substantial evidence. We therefore hold that the court correctly concluded that this practice on CLA's part was deceptive.

CLA disagrees and contends that Panag is inapposite because that case "dealt with facial falsehoods qualified by an inconspicuous disclaimer." It claims that the trial court here "made no finding that *any* CLA-ESI statement was objectively false" because the findings "concede" that CLA's claims "about RLTs and wills may be true depending on the individual circumstances." But the court did indeed find that CLA's representations were "not accurate" and "materially misleading." This is a clearer case than in Panag, where the court reasoned that

11

the notices contained truthful information but that an ordinary consumer would not understand the meaning of the truthful disclaimer.

CLA claims it clearly disclaimed that RLTs "were not for everyone" because of a statement on page 39 of the workbook: "If you own titled assets and want your loved ones (spouse, children or parents) to avoid court interference at your death or incapacity, consider a revocable living trust." Even if this disclaimer actually indicated that RLTs might not be the best choice for everyone in attendance at CLA's seminars, it is one sentence in a series of small questions on page 39. We conclude that this does not affect the net impression given by CLA, and we affirm the trial court's conclusion that CLA's representations were deceptive.

<u>Disclosure about CLA Insurance Salespeople</u>

CLA challenges the court's conclusion that CLA's marketing of its Lifetime Estate Plan created "a deceptive net impression that [consumers] were purchasing robust estate planning services, and not in-home visits from commission-motivated insurance agents." We hold that this conclusion is supported by substantial evidence.

Unchallenged findings establish that CLA told consumers that the Lifetime Estate Plan involved a "CLA financial planner" providing in-home meetings "to ensure [the] plan is kept up to date with tax, financial and family changes" and that the planner could "help you in many ways including financial guidance, tax evaluation, long term health planning, and legacy planning." CLA described in detail how this planner would go over the documents and the client's assets to

ensure "everything is going smoothly" and "help you keep your planning on the right track." A CLA seminar presenter "testified that he did not discuss the sale of annuities when he was discussing any of these workbook pages related to CLA's services." Two brief mentions of insurance in the workbook indicated that CLA offered insurance products but "embed[ded] the mention of insurance in a broad list of estate planning services and present[ed] it only as something that can be offered if needed, not as something that must occur for CLA's agents to make a living." Consumers who attended the seminars testified that insurance and annuities were not referenced at the seminars and that they did not understand that CLA sold insurance or that the in-home review meetings would be conducted by insurance agents. But in fact, the CLA representatives were paid only $25 for delivery meetings and only $10 for review meetings, and only received additional compensation through commissions from annuities sales, indicating that "the sale of annuity products to CLA's clients was CLA's overriding objective." And the fact that CLA agents "assist[ed] with and deliver[ed] consumers' estate documents caused consumers to place their trust in [the agents], which in turn allowed [them] to sell them insurance products."

We conclude that this constitutes a deceptive practice. CLA indicated to consumers that its purpose at the in-home meetings was to assist them with their estate planning process, when in fact its purpose was to "gather lists of assets that could be moved into annuity products" and then to sell them these products. This deception provided CLA with trusting, amenable clients to visit, making these visits particularly desirable from a sales perspective.

13

CLA disagrees. It points first to the references to insurance in CLA's workbook, and again contends that court erred by relying on Panag because Panag supposedly "did not address the adequacy of true and correct disclosures." This is inaccurate. Panag discussed the adequacy of disclosures that "accurately state[d] the demand was related to a subrogation claim." Id. at 49-50. CLA contends that accepting the court's conclusion that the workbooks did not "adequately disclose" that CLA agents would try to sell insurance would have drastic impacts on every salesperson who sells multiple products in conjunction with a sale. But most salespeople do not mislead consumers as to their intentions in order to create a warm and trusting environment for the sale of additional products. We are not persuaded.

CLA next points to disclosures in their consumer information and disclosure agreement and welcome letters, which clients received upon purchasing a service package, indicating that CLA agents might discuss insurance products. The court relied on Robinson v. Avis Rent A Car Sys., Inc., 106 Wn. App. 104, 116, 22 P.3d 818 (2001), for the proposition that "a practice is unfair or deceptive if it induces contact through deception, even if the consumer later becomes fully informed before entering into the contract." The court in Robinson concluded that a rental car company engaged in a deceptive practice by "quoting a car rental price that does not include a concession fee that is also charged," even though it disclosed the concession fee "later at the airport car rental counter when customers sign[ed] the car rental agreement." 106 Wn. App. at 115-16. CLA contends that this case is distinguishable from Robinson

14

because its clients "were offered annuities they had no obligation to purchase." But the point is that CLA clients purchased the Lifetime Estate Plan under false pretenses, and the nature of the in-home visits they were purchasing was not disclosed until they made the decision to purchase the plan. We are not persuaded.

Lastly, CLA cites to seminar admission tickets, promotional flyers and postcards, and "CLA's Promise to customers," that all contain mentions of insurance. But there is no evidence about who received these materials, and the latter two items involve no cite to the record whatsoever. Moreover, it is unlikely that any of these disclosures would cure the deceptive net impression, given that they do not explain that CLA agents' goal is to sell insurance and consumers did not understand that CLA sold insurance.[5]

We hold that the court correctly concluded that CLA's marketing of its Lifetime Estate Plan created "a deceptive net impression that [consumers] were purchasing robust estate planning services, and not in-home visits from commission-motivated insurance agents."

<u>EDDA Violations</u>

CLA contends that the court erred by concluding that its business model violated the EDDA. We disagree.

---

[5] CLA also contends that the court erred in concluding that "CLA created the opportunity for its agents to market insurance products to consumers in their homes . . . [y]et CLA made little effort to provide safeguards to protect its clients from being taken advantage of by overly aggressive or improper sales tactics." CLA contends that "this conduct does not rise to the level of unfair or deceptive." But the court did not conclude that this practice was unfair or deceptive or that it constituted a CPA violation, so we need not address this contention.

15

The EDDA declares it "unlawful for a person to market estate distribution documents, directly or indirectly, in or from this state unless the person is authorized to practice law in this state," with certain exceptions for financial institutions, accountants, and tax agents. RCW 19.295.020(1), (4)-(6). "Marketing" is defined as "includ[ing] every offer, contract, or agreement to prepare or gather information for the preparation of, or to provide, individualized advice about an estate distribution document." RCW 19.295.010(4). And " '[g]athering information for the preparation of an estate distribution document' means collecting data, facts, figures, records, and other particulars about a specific person or persons for the preparation of an estate distribution document." RCW 19.295.010(3). A violation of the EDDA is a violation of the CPA. RCW 19.295.030.

The legislature's explicit intention in enacting the EDDA was "to prohibit the marketing of services related to preparation of estate distribution documents by persons who are not authorized to practice law or who are not a financial institution." RCW 19.295.005. This was based on its finding that "the practice of using 'living trusts' as a marketing tool [by unauthorized individuals] for purposes of gathering information for the preparation of an estate distribution document [is] a deceptive means of obtaining personal asset information and of developing and generating leads for sales to senior citizens." RCW 19.295.005.

Here, the plain language of the EDDA supports the court's conclusion that CLA's practices violated the EDDA. CLA routinely offered to gather, and gathered, financial information from its clients, and it represented that it was

16

gathering this information so that the clients' attorneys could prepare estate distribution documents. The trial court's unchallenged findings note that when a consumer purchased CLA's Lifetime Estate Plan, the CLA representative "worked with the client to complete a Client Information Form that identified the client's name, contact information, emergency contacts, reasons for purchasing the Lifetime Estate Plan, value of the estate, and number of real estate holdings." CLA then "continued to gather information for use in the preparation of a client's estate distribution documents after its agents completed the Client Information forms," such as copies of deeds and information about assets and beneficiaries. CLA continued this conduct throughout its relationship with its clients. Because CLA represented that it was gathering this information to enable the preparation of estate distribution documents, and the CLA agents were not authorized to practice law, this conduct violated the EDDA.

CLA makes several arguments to explain why this outcome is incorrect, disputing factual, statutory, constitutional, and policy issues. We are not persuaded.

1. CLA's Factual Characterizations of its Activities

First, CLA claims that it did not gather information for the preparation of estate distribution documents, but instead gathered the information "for [its] own business and sale purposes." While this may be a more candid statement of CLA's business model than it gave to consumers, unchallenged findings and the record as a whole clearly establish that CLA represented, and its clients understood, that it was gathering information for the preparation of estate

17

distribution documents. CLA also did indeed share the information it gathered with the consumers' attorneys. Because the EDDA is targeted at preventing the "gathering [of] information for the preparation of an estate distribution document [as] *a deceptive means of obtaining personal asset information* and of developing and generating leads for sales to senior citizens," the fact that CLA had hidden motives for gathering information cannot prevent it from being liable under the EDDA. RCW 19.295.005. (Emphasis added.) We hold that under the EDDA, the test of whether information is gathered for the preparation of estate distribution documents turns on the purpose that is presented to and understood by the consumer.

Next, CLA appears to contend that it used revocable living trusts as a marketing tool but did not market revocable living trusts themselves, and that the court erred by conflating the two. But to make this argument, CLA focuses on its actions in advocating the benefits of revocable living trusts at seminars. This line of reasoning fails because those acts are not what the court concluded violated the EDDA—the EDDA violations were offering to gather, and gathering, information from specific consumers for the preparation of estate distribution documents.

Finally, CLA also contends that because not all the information it gathered was ultimately used by attorneys to prepare estate distribution documents, it did not violate the EDDA. But as discussed above, what matters is the purpose for gathering the information, and here the purpose was unambiguously presented

and understood as enabling the preparation of estate distribution documents. We therefore remain unpersuaded.

### 2. Statutory Construction

CLA next contends that the EDDA should be read as only prohibiting gathering information for the preparation of an estate distribution document where both the information gathering and the actual preparation of the document are done by a non-lawyer. But "a court must not add words where the legislature has chosen not to include them." Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003). The EDDA makes it unlawful for a non-lawyer to gather information for the preparation of an estate distribution document. RCW 19.295.020(1); RCW 19.295.010(4). This simple construction is in line with the legislature's concern about people using estate planning as an excuse to "obtain[ ] personal asset information and . . . develop[ ] and generat[e] leads for sales to senior citizens." RCW 19.295.005. And, indeed, "[a]lthough CLA agents represented to consumers that the Road of Retirement's purpose was to gather information for estate planning purposes, CLA expected its agents to use the Road [of] Retirement as a sales tool." CLA's business model therefore falls squarely within the realm of the EDDA's prohibited conduct, as expressed by the legislature's statement of intent and the plain language of the statute.

### 3. Unlawful Practice of Law

CLA contends that the trial court's construction of the statute would broaden the definition of the practice of law, thereby violating the court's power to define and regulate the practice. It relies on legislative history and contemporary

19

case law indicating that the EDDA was passed with the intent of regulating the unauthorized practice of law. But we need not evaluate these materials because the EDDA, as enacted, does not mention, define, or regulate the unauthorized practice of law. RCW 19.295.005-030. We need not look beyond the plain meaning of the statute, which by its terms defines a violation of the CPA, not the unauthorized practice of law.

### 4. Vagueness and Fair Notice

CLA contends that the EDDA is void for vagueness.[6] We disagree.[7]

"Vagueness in a statute raises an issue of procedural due process. The crucial question is whether the statute provides fair notice of the conduct prohibited." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 11, 721 P.2d 1 (1986). "Under the Fourteenth Amendment,[8] a statute may be void for vagueness if it is framed in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application." Id. But if it is clear what the statute as a whole prohibits, the statute is not vague. Id. And "[a]

---

[6] CLA raises this issue in its challenge to the penalties imposed by the court, but it is discussed here for clarity.

[7] The State contends that the void for vagueness doctrine does not apply to this case because it is primarily a criminal doctrine. But due process considerations apply here because CLA is being deprived of property. See Yim v. City of Seattle, 194 Wn.2d 682, 688, 451 P.3d 694 (2019), as amended (Jan. 9, 2020) ("The procedural component [of due process] provides that '[w]hen a state seeks to deprive a person of a protected interest,' the person must 'receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation.' " (quoting Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006))).

[8] U.S. Const. amend. XIV.

statute's announced purpose can provide the clarity necessary to establish what a statute prohibits."  Id.

CLA's only real contention about a possible alternate interpretation of the EDDA is that it "did not understand that filling out a form that *might* later be used by a lawyer to create estate planning documents for his or her own client would violate the statute."  But as discussed above, the EDDA clearly prohibits nonlawyers gathering information *for the purpose of* preparing estate distribution documents.  Where CLA told consumers it was gathering the information for that exact purpose, nothing in the language of the EDDA indicates that it would matter whether that purpose was ever effected.  Nor is it true that under the trial court's interpretation of the EDDA, "nearly every type of service or paperwork that mentions estate planning documents would come within the purview of the EDDA."  The trial court concluded that CLA's offers to gather information for the purpose of preparing estate planning documents were violations of the EDDA; this is a narrow and proper interpretation of the EDDA that does not affect services or paperwork that merely mention estate planning documents.

We conclude that the EDDA is unambiguous and not vague.

5.  First Amendment

Finally, CLA makes mention in passing to a violation of its First Amendment[9] rights, citing Kitsap County v. Mattress Outlet, 153 Wn.2d 506, 512, 104 P.3d 1280 (2005).  However, it makes no attempt to analyze the test articulated in that case for whether a commercial speech restriction is

---

[9] U.S. CONT. amend. I.

permissible.  We therefore need not address this issue.  <u>Health Ins. Pool v.</u>
<u>Health Care Auth.</u>, 129 Wn.2d 504, 511, 919 P.2d 62 (1996) (" 'naked castings
into the constitutional sea are not sufficient to command judicial consideration
and discussion' " (internal quotation marks omitted) (quoting <u>State v. Johnson</u>,
119 Wn.2d 167, 171, 829 P.2d 1082 (1992))).

Penalties and Restitution

CLA then challenges the trial court's award of restitution and civil penalties
on several bases.  We find no error.[10]

1.  <u>Proof of Causation and Damages</u>

CLA first contends that the court erred by concluding that the State need
not prove causation and damages for restitution.  We disagree.

RCW 19.86.080(1) permits the AGO to sue to restrain and prevent CPA
violations.  RCW 19.86.080(2) provides that the court may also "make such
additional orders or judgments as may be necessary to restore to any person in
interest any moneys . . . which may have been acquired by means" of a CPA
violation.  When "the Attorney General brings a CPA enforcement action on
behalf of the State, it must prove (1) an unfair or deceptive act or practice, (2)
occurring in trade or commerce, and (3) public interest impact."  <u>Kaiser</u>, 161 Wn.
App. at 719.  "Unlike in a private cause of action under the CPA, the State is not
required to prove causation or injury, nor must it prove intent to deceive or actual
deception."  <u>Id.</u>

_____

[10] As discussed above, we reject CLA's contention that the court's award
of penalties for EDDA violations violates the principle of fair notice because the
statute is not vague.

22

The private cause of action under the CPA is established in RCW 19.86.090, which permits "[a]ny person who is injured in his or her business or property" by a CPA violation to sue "to recover the actual damages sustained by him or her." Our Supreme Court clarified the elements of a private cause of action under the CPA in Hangman Ridge. The Court specified that private plaintiffs must make a "showing of injury . . . in [their] business or property" and must establish "a causal link . . . between the unfair or deceptive act complained of and the injury suffered." 105 Wn.2d at 785. The Court relied on the specific language in RCW 19.86.090 as rationale for establishing both of these elements.

Under Kaiser, the AGO was not required to prove causation or damages for the restitution awards to private consumers. The statutory requirement for proving causation and damages is located only in the private cause of action section, which is not at issue here. CLA cites Nuttall v. Dowell, 31 Wn. App. 98, 110, 639 P.2d 832 (1982), for the proposition that the AGO "must establish some causal link between a defendant's unfair act and a consumer's injury." But Nuttall specifically provides that such a causal link is only required in "a private action in which plaintiff seeks recovery of damages," and that in an attorney general action "which seeks to enjoin *or otherwise deter* CPA misconduct," no consumer reliance on the deception must be shown. 31 Wn. App. at 110 (emphasis added). Requiring a company to pay restitution deters CPA misconduct.

23

CLA does not challenge the court's findings that it received $2,565,626 in revenue from sales of the Lifetime Estate Plan and $3,597,287.93 in commissions from the sale of insurance products. The court did not err by concluding that this money should be restored to CLA's clients, given that it was "acquired by means of any act" prohibited by the CPA. RCW 19.86.080(2).

2. Calculation of Restitution

Relatedly, CLA contends that the court erred by awarding restitution based on disgorgement of illegal gains, rather than consumer loss. But as noted, RCW 19.86.080(2) permits the court to "restore to any person . . . *any moneys . . . which may have been acquired*" by a CPA violation. (Emphasis added). This is in contrast to RCW 19.86.090's provision that a private plaintiff may only seek "the actual damages sustained." CLA cites no law in support of its contention that the court should have awarded restitution based only on net damages to the clients. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

3. Guidance from the Office of the Attorney General

CLA contends that the court erred by finding that CLA did not act in good faith, and awarding significant penalties on that basis, because CLA sought guidance from the AGO and it implicitly approved of CLA's business model. But CLA's characterization of the relevant facts and law is misleading.

The AGO first issued a CID to CLA in 2013. CLA cooperated in the investigation and offered multiple times to meet with the AGO to "help your office understand what exactly CLA ESI and CLA USA do before you speak to consumers." The AGO declined to meet: "for [our] purposes, a meeting to have your client discuss and identify how CLA operates is not necessary." In August 2014, the AGO again declined an offer to meet, saying, "At this time, [we] will decline the opportunity because [our] office is still in an investigative stage in this matter." The AGO did not indicate to CLA that its investigation was over or that it had made any determinations about the legality of CLA's actions. In February 2017, it issued a second CID against CLA, and in October 2017, it provided CLA with notice of its intent to file the present action.

These facts do not include any explicit or tacit indication from the AGO that it had concluded CLA's business model was lawful. And the case law CLA cites to support its theory refers to a situation in which "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation." Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 70 n.20, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). This is not such a case: neither statutory text, court guidance, nor agency guidance indicate that CLA's interpretation of the law was reasonable.

We share CLA's concern about the AGO's delay in prosecuting the case, even though we acknowledge the complexity inherent in this type of litigation. The delay is incongruous to the AGO's strong statement that CLA "exploited Washington senior citizens through a deceptive scheme designed to manipulate

25

them into purchasing expensive estate-planning packages and annuities," especially given that such delay allowed for more consumers to be subjected to CLA's practices. However, the AGO's delay in prosecuting this case did not lead to a presumption that CLA's business model was appropriate. And the court entered multiple other findings and conclusions—addressing CLA's use of scare tactics, lack of oversight for agents, admissions that CLA valued sales over standards, CLA's practices of taking advantage of consumers who placed their trust in CLA—supporting its conclusion that CLA did not act in good faith. We conclude that the court did not err by finding that CLA did not act in good faith.

### 4. Civil Penalties

Finally, CLA broadly contends that the court abused its discretion by imposing excessive civil penalties. CLA examines the penalties imposed in other King County Superior Court trust mill cases and contends that the sum of civil penalties and restitution here is "more than $60,500 per customer—*i.e.*, more than 60 times the next closest sanction" imposed in an estate-related CPA case.[11] CLA gives no justification for its comparison of these values on a "per customer" basis as opposed to a "per violation" basis. See State v. Ralph Williams' N. W. Chrysler Plymouth, Inc., 87 Wn.2d 298, 317, 553 P.2d 423 (1976) ("This statute vests the trial court with the power to assess a penalty for each violation."). CLA does not challenge the court's analysis of the public injury

---

[11] The State notes in its response that these awards were all settlements or default judgments. Because the parties did not submit any of the relevant orders to us, we cannot confirm the award amounts or how the judgments were obtained.

26

caused by its actions or its ability to pay. Former RCW 19.86.140 (1983) permits the court to award penalties of up to $2,000 for a violation of the CPA.[12] We conclude that the court did not abuse its discretion in imposing the maximum penalty for many of CLA's CPA violations.

### Attorney Fees

The State requests attorney fees and costs on appeal under RCW 19.86.080(1), which provides that the prevailing party in a CPA case "may, in the discretion of the court, recover the costs of said action including a reasonable attorney's fee." Because the State prevails on appeal, we award it fees on appeal.

We affirm.

Smith, A.C.J.


WE CONCUR:

---

[12] As of July 2021, the statute permits sanctions of up to $7,500 for the same violations. RCW 19.86.140.